IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LESTER LEE SCARBROUGH, JR.,

                    Plaintiff,                    Civil Action No.
              v.                                  9:09-CV-0850 (NAM/DEP)

MR. EVANS, OMH Social Worker; SMITH,
Nurse Administrator; R.N. SMITH;
VITALINE LaPAGE, Corrections Counselor;
and JOSEPH BELLNIER, Upstate Correctional
Facility,

                    Defendants.

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

LESTER LEE SCARBROUGH, JR., *Pro Se*
08-B-0351
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANTS:

HON. ANDREW M. CUOMO              CHRISTINA ROBERTS-RYBA, Esq.
New York State Attorney General   Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Lester Lee Scarbrough, Jr., a New York State prison inmate who is proceeding *pro se* and *in forma pauperis* ("IFP"), has commenced this action pursuant to 42 U.S.C. § 1983, alleging that during the course of his confinement he was deprived of his civil rights. In his complaint, although somewhat difficult to decipher, plaintiff appears to challenge the adequacy of the mental health treatment provided to him, and potentially also to complain of defendants' failure to keep him secure and protect him from harm.  As relief, plaintiff's complaint seeks recovery of damages in the amount of $1 million.

In response to plaintiff's claims, which have been significantly narrowed as a result of an earlier court decision issued following a routine review of plaintiff's complaint, the defendants remaining in the action have filed two separate but similar motions to dismiss, arguing that plaintiff's complaint does not plead a plausible Eighth Amendment violation.  Having considered defendants' motions and plaintiff's opposition, I recommend that the complaint in this action be dismissed, with leave to replead.

2

I.    BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS").  *See Generally* Complaint (Dkt. No. 1).  At the times relevant to his claims, Scarbrough was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York, and assigned to a special housing unit ("SHU") cell, presumably for disciplinary purposes.[2]  *Id.; see also* Plaintiff's Exhs. (Dkt. No. 4) at p. 3 of 6.

Plaintiff has a history of suffering from diagnosed mental impairments dating back to his childhood.  Complaint (Dkt. No. 1) § 4.  At various times, Scarbrough has been diagnosed as suffering from

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).  Portions of the background description which follows have been derived from the exhibits submitted by the plaintiff in support of his complaint, *see* Dkt. No. 4,  which materials may also properly be considered in connection with a dismissal motion.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

schitzoaffective disorder, attention deficit-hyperactivity disorder ("ADHD"),

mental retardation, and bipolar disorder, resulting in both treatment and

placement in special education classes.  *Id.*

Since the onset of his confinement at Upstate plaintiff has

expressed fear for his safety to various prison officials, including

defendant Evans, who he identifies as an Office of Mental Health ("OMH")

social worker.  Complaint (Dkt. No. 1) § 4.  Plaintiff also has stated to

prison officials that he feels suicidal, regardless of whether he is on or off

medication.  *Id.*

Plaintiff has written to various persons, both at Upstate and

elsewhere, including Upstate Superintendent Joseph Bellnier, to voice his

concerns.  *Id.*  Plaintiff's letter to Superintendent Bellnier appears to have

been referred to S.M. Lacey, a corrections captain, for investigation and

response.  Plaintiff's Exhibits (Dkt. No. 4) at p. 2 of 6.  After reviewing the

matter, Corrections Captain Lacey sent an Interdepartmental

Communication to the plaintiff, advising as follows:

> Your letter addressed to the Superintendent has
> been received.  You were interviewed by your
> Housing Sergeant regarding several issues which
> you raised in the letter.  Although the majority of
> your issues are beyond the scope of what the
> Department can do to alleviate, I strongly urge you

4

> to continue to maintain an open line of
> communication with your Counselor and Security
> Staff assigned to you and your area.  If you do find
> that you are having issues which may be more
> adequately addressed by this administration
> please do not hesitate to write.

*Id.*

Plaintiff also has orally voiced his concerns to various persons, among them defendant Vitaline LaPage, identified as a counselor at Upstate.  Complaint (Dkt. No.1) § 4.  According to the plaintiff, when defendant LaPage assisted him in completing a survey which asked, among other things, whether he had any concerns regarding safety, she indicated in a response on his behalf that he had no such concerns, knowing that the contrary was true.

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on July 28, 2009.  Dkt. No. 1. Plaintiff's complaint names several DOCS employees assigned to work at Upstate as defendants, including OMH Social Worker Evans; Nurse Administrator Smith; Registered Nurse Smith; Vitaline LaPage, a corrections counselor; and Superintendent Bellnier.  In his complaint plaintiff asserts three separate causes of action, alleging malpractice, negligence, and cruel and unusual punishment in violation of the Eighth

Amendment.[3]  *Id.* Following a routine review of plaintiff's complaint and
accompanying IFP application, on August 24, 2009 Chief District Judge
Norman A. Mordue issued a decision and order dismissing plaintiff's
claims against the DOCS and R.N. Smith, as well as those against Nurse
Administrator Smith for interfering with plaintiff's grievance, and
additionally dismissing plaintiff's claims of malpractice and negligence.[4]
Dkt. No. 6.

In response to plaintiff's complaint the remaining defendants have
interposed two separate, though similar, motions seeking dismissal of his
claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.
The first of those was filed on behalf of defendants Evans, Smith, and
Bellnier on December 16, 2009.  Dkt. No. 24.  The second, filed on April 6,
2010, was interposed by defendant LaPage.  Dkt. No. 36.  Both motions
challenge the sufficiency of plaintiff's remaining allegations and argue that
they do not support a plausible Eighth Amendment claim.  Defendants'

---

[3]     Although not identified as such in the body of plaintiff's complaint, in the
caption plaintiff also lists the DOCS as a defendant.

[4]     Since that time the court has also issued two decisions denying two
separate motions by the plaintiff for preliminary injunctive relief.  Dkt. Nos. 27, 38.
Among the relief sought by the plaintiff in his applications for a preliminary injunction
was an order directing the DOCS to transfer him out of Upstate and into another
correctional facility.  *See id.*

motions, both of which plaintiff has opposed, *see* Dkt. Nos. 26, 37, have

been referred to me for the issuance of a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

      A.    Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure, calls upon a court to gauge the

facial sufficiency of that pleading, utilizing as a backdrop a pleading

standard which, though unexacting in its requirements, "demands more

than an unadorned, the-defendant-unlawfully-harmed me accusation" in

order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129

S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S.

554, 555, 127 S.Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of

Civil Procedure requires that a complaint contain "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed.

R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule

commands that a complaint contain more than mere legal conclusions;

"[w]hile legal conclusions can provide the framework of a complaint, they

must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp.2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but

8

whether the claimant is entitled to offer evidence to support the claims.'"

*Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d

435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69

F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

   B.   Deliberate Medical Indifference

      One of the two primary areas of focus of plaintiff's complaint

appears to be the adequacy of the medical treatment that he received

while at Upstate.  In support of his claim that the defendants failed to

provide him with the minimum level of care guaranteed under the

Constitution, plaintiff offers a recitation of his history of mental illness, and

asserts that while at Upstate he has feared for his safety, felt suicidal, on

occasion could not eat, and has been unable to control his thoughts.

      Claims that prison officials have intentionally disregarded an

inmate's medical needs fall under the umbrella of protection from the

imposition of cruel and unusual punishment afforded by the Eighth

Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285,

290, 291 (1976).  The Eighth Amendment prohibits punishment that

involves the "unnecessary and wanton infliction of pain" and is

incompatible with "the evolving standards of decency that mark the

progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[5]  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm.  *See Salhuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

### 1.   Objective Requirement

Analysis of the objective, "sufficiently serious", requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious.  *Id*. at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

11

2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a

12

condition untreated may or may not raise constitutional concerns,

depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting,

*inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

Relevant factors informing this determination include whether the plaintiff

suffers from an injury or condition that a "'reasonable doctor or patient

would find important and worthy of comment or treatment'", a condition

that "'significantly affects'" a prisoner's daily activities, or "'the existence of

chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted);

*Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3

(N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

### 2.    Subjective Element

The second, subjective, requirement for establishing an Eighth

Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of

one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing

*Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)).

Deliberate indifference, in a constitutional sense, exists if an official

"knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of facts from which the inference could be

13

drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S.Ct. 1970).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action.  *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.  Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference.  *Harrison,* 219 F.3d at 139.  If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as

14

punishment or for other invalid reasons," however, such conduct is

actionable as deliberate indifference.  *Harrison,* 219 F.3d at 138;  *Kearsey*

*v. Williams,* No. 99 Civ. 8646, 2005 WL 2125874, at *5  (S.D.N.Y. Sep. 1,

2005).

Recognizing the deference owed to plaintiff's complaint at this

procedural stage, I find that it sufficiently alleges the existence of medical

needs which objectively could be regarded as sufficiently serious to

support a cognizable medical indifference claim.  As plaintiff correctly

notes in his responsive papers, the Eighth Amendment's requirements

that a prison inmate's serious medical needs must be met extends beyond

physical impairments to include mental impairments as well. *Guarneri v.*

*Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27,

2008) (Homer, M.J.) (citing *Guglielmoni v. Alexander*, 585 F.Supp. 821,

826 (D. Conn. 1984)); *see also Cuoco v. Moritsugu*, 222 F.3d 99,106 (2d

Cir. 2000).  The allegations in plaintiff's complaint concerning the

diagnoses rendered over time for his mental impairments suffice, at this

early procedural juncture, to satisfy the objective component of the

prevailing test.  *See Hamm v. Hatcher*, No. 05-CV-503, 2009 WL

1322357, at *7 (S.D.N.Y. May 5, 2009).

Conspicuously lacking in plaintiff's complaint, however, is any allegation of fact demonstrating that the named defendants in this action were deliberately indifferent to his medical needs.  Indeed, plaintiff's complaint does not allege even in a conclusory fashion - which alone would not suffice to establish a plausible claim – that the defendants have refused to provide him with proper treatment for his mental condition. Accordingly, I recommend a finding that plaintiff's complaint fails to allege a plausible Eighth Amendment deliberate medical indifference cause of action.  *See Young v. Couglin*, 1998 WL 32518, at *4-7 (S.D.N.Y. 1998), *aff'd* 182 F.3d 902 (2d Cir. 1999).

C.     Failure to Protect

In addition to potentially asserting a deliberate medical indifference cause of action, plaintiff's complaint also appears to center upon his contention that he was exposed to danger while at Upstate, springing largely from his mental impairments, the argument seemingly being that defendants did not adequately address plaintiff's concerns regarding his safety and security.

1.     Eighth Amendment

Also encompassed within the protections afforded under the Eighth

Amendment is the requirement that prison officials take reasonable measures to guarantee the safety of inmates; this duty includes within it an obligation to protect prisoners from harm caused by fellow inmates. *Farmer*, 511 U.S. at 833-34, 114 S.Ct. at 1976-77 (citations omitted); *see also Matthews v. Armitage*, 36 F. Supp 2d 121, 124 (N.D.N.Y. 1999) (Homer, M.J.) (citing, *inter alia*, *Farmer*).  When examining a failure to protect claim under the Eighth Amendment, a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer*, 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Matthews*, 36 F. Supp.2d at 124-25; *Coronado v. Lefevre*, 886 F. Supp. 220, 224 (N.D.N.Y. 1995) (Scullin, J.).  As can be seen, like the analysis of plaintiff's medical indifference claim, the analysis of a failure to protect cause of action entails both an objective and subjective inquiry.

### a.    Objective Test

In objective terms, a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it denied him or her the "minimal civilized measure of life's necessities."  *Dawes v. Walker*, 239 F.3d 489, 493-94

(2nd Cir. 2001) (internal quotations and citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992 (2002).  Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Dawes*, 239 F.3d at 493; *Matthews*, 36 F. Supp. 2d at 124-25.

b. <u>Subjective Test</u>

To demonstrate that defendants were deliberately indifferent to his or her plight, a plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his or her health and safety – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979; *Matthews*, 36 F. Supp. 2d at 124-25.

2. <u>Fourteenth Amendment</u>

Claims involving the alleged failure of prison officials to protect an inmate from harm are also subject to review under the Fourteenth Amendment's substantive due process provision.  Though the requisite

18

mental state for establishing a Fourteenth Amendment failure to protect claim is somewhat unclear, it is at least apparent that to be legally cognizable under that provision, the actions alleged on the part of a defendant must transcend mere negligence. *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S.Ct. 668, 670 (1986) (lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent); *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663 (1986) (same); *Morales v. New York State Dep't of Corrs*., 842 F.2d 27, 30 (2nd Cir. 1988) (section 1983 does not provide cause of action for negligent failure of prison officials to protect an inmate from injury); *Abdul-Matiyn v. New York State Dept of Corr. Servs*., 871 F. Supp. 1542, 1546-47 (N.D.N.Y. 1994) (Chin, J.) (citing *Morales*).

As is the case with his deliberate medical indifference claim, plaintiff has failed to incorporate within his complaint sufficient allegations demonstrating the existence of a plausible cause of action for failure to protect under either the Eighth or Fourteenth Amendments. While plaintiff alleges at various points that he has felt fear for his safety, his complaint fails to offer specific allegations from which the court could conclude, accepting the allegations as true and drawing all inferences in his favor,

19

that he was in fact incarcerated under conditions posting a substantial risk of serious harm.  Similarly, plaintiff's complaint fails to contain assertions to show that the defendants knew of but disregarded an excessive risk to his health and safety.  Plaintiff's failure to protect that claim is therefore similarly subject to dismissal.[6]  *See Polson v. Fischer*, No. 9:08-CV-030, 2010 WL 2985476, at *6-7 (N.D.N.Y. June 16, 2010) (Peebles, M.J.), Report and Recommendation Adopted, 2010 WL 2925362 (N.D.N.Y. Jul. 21. 2010) (McAvoy, S.J.).

D.    Cruel and Unusual Punishment

Generously construed, plaintiff's complaint could also be considered to assert the claim of cruel and unusual punishment based upon the conditions experienced while in SHU confinement at Upstate.  The gravamen of plaintiff's cruel and unusual punishment claim appears to be

---

[6]    The essence of plaintiff's claim against defendant LaPage appears to be that she made a false entry on an official document reflecting that plaintiff did not fear for his safety when, in fact, the opposite is true.   While perhaps this could be perhaps plausibly satisfy the subjective prong of the failure to protect test, for purposes of that defendant, plaintiff nonetheless has failed to establish the objective prong by demonstrating that he was incarcerated under conditions posing a substantial risk of harm, thereby providing an adequate basis for dismissal of his failure to protect claim as against that defendant as well.  *See Sims v. Bowen*, No. 96-cv-655, 1998 WL 146409, *3 (N.D.N.Y. March 23, 1998) (Pooler, J.) (noting that "an inmate must inform a correctional officer of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference").

that while in SHU he was not permitted use of a typewriter, he was not allowed to participate in every day activities, and the conditions of his confinement were unpleasant.

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of "'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus*, No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (quoting *Alvarez v. County of Cumberland*, Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May*, 2010 WL 1286800, at *4 (quoting *Alvarez*,1009 WL 750200, at *2).   As was the case with his medical indifference and failure to protect potential claims, plaintiff's complaint fails to include sufficient factual allegations to demonstrate the existence of a plausible cruel and unusual punishment claim based upon the conditions experienced while in SHU confinement. *Colon v. Howard*, 215, 227 (2d Cir. 2000) (noting that "normal conditions of SHU

21

confinement in New York", which can include solitary confinement, being

kept in a cell for 23 hours a day, exercise limited to one hour a day,

showers limited to two per week, denial of various privileges available to

general population prisoners, such as the opportunity to work and obtain

out-of-cell schooling, and limited visitors and access to books, do not

violate the Eighth Amendment).  Accordingly, I recommend dismissal of

this cause of action as well.

### E.    Personal Involvement

In their motion defendants also seek dismissal of plaintiff's claims

against defendant Bellnier, the Superintendent at Upstate, on the

independent ground  that plaintiff's complaint fails to establish his

personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

*Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct.

1282 (1978)).  In order to prevail on a section 1983 cause of action

against an individual, a plaintiff must show some tangible connection

between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Defendant Bellnier appears to have been named as a defendant in this action based upon his position as the Superintendent at Upstate.  It should be noted, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Complicity on the part of a supervisory official in a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal*, ___ U.S. ___,129 S.Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d

865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In this instance, the plaintiff's claim against Superintendent Bellnier appears to stem from his refusal to act upon plaintiff's letter of complaint, sent on or about July 6, 2009.  The allegation that the superintendent ignored plaintiff's letter, even if true, is nonetheless insufficient without more to establish the requisite personal involvement on his part in the constitutional violations alleged.  *Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F. Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)). The fact that, rather than ignoring the letter, Superintendent Bellnier instead may have passed it along to a subordinate for investigation and handling likewise fails to support plaintiff's claim, since such action does not suffice to establish the requisite level of personal involvement on the part of a supervisory employee. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d

24

Cir. 1997); *Garvin v. Goord*, 212 F.Supp. 2d 123, 126 (W.D.N.Y. 2002).

Because plaintiff's complaint fails to allege the existence of facts demonstrating a plausible constitutional claim against Superintendent Bellnier, I recommend dismissal of plaintiff's claims against him on this separate, independent basis.

F.     Leave To Amend

The next issue to be addressed is whether, in deference to his *pro se* status, plaintiff should be afforded the opportunity to amend his complaint in order to allege facts demonstrating the existence of one or more plausible constitutional claims.  Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).

At this early procedural juncture, based upon the scant record now

before the court, I am unable to conclude that plaintiff cannot possibly

allege the existence of one or more viable constitutional claims based

upon the circumstances set forth in his complaint.  Accordingly, I

recommend that he be given the opportunity to amend.  Plaintiff should be

reminded, however, that any subsequent amended complaint submitted to

the court should be in proper form, including separately numbered

paragraphs each limited, to the extent practicable, to setting forth a single,

discrete set of circumstances.  *See* Fed. R. Civ. P. 10(b); *see also Hunt v.*

*Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, C.J.) ("complaints

relying on the civil rights statutes are insufficient unless they contain some

specific allegations of fact indicating a deprivation of rights, instead of a

litany of general conclusions that shock but have no meaning.") (citing

*Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (other citations

omitted)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 U.S. Dist.

LEXIS 7136, at *24-25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation

omitted).  Any such amended complaint, which shall supersede and

replace in its entirety the previous complaint filed by plaintiff, must contain

a caption that clearly identifies, by name, each individual or entity that

plaintiff is suing in the present lawsuit, and must bear the case number

assigned to this action.  *See Harris v. City of N.Y.*, 186 F.3d 243, 249 (2d

Cir. 1999) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128

(2d Cir. 1994)); Fed. R. Civ. P. 10(a).

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action, which is set forth in narrative

fashion, fails to contain sufficient factual allegations to support a plausible

constitutional claim, whether in the form of a deliberate medical

indifference cause of action, a claim for failure to protect him from known

harm, or a cause of action for cruel and unusual punishment based upon

the unpleasant conditions allegedly experienced by him while in SHU

confinement.  Plaintiff's complaint also fails to properly allege facts

demonstrating defendant Bellnier's personal involvement in any

constitutional violation claimed.  Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motions to dismiss (Dkt. Nos. 24,

36) be GRANTED, and that plaintiff's complaint in this action be

DISMISSED, with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within FOURTEEN days of service of this

report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     August 10, 2010
           Syracuse, NY



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy, and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia*, his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se*. As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom was assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

*4 The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurre," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamplets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

[FN11.] Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by [42 U.S .C. § 1997e(a)](#) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

[FN15.](#) The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *[Flanagan v. Maly, 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002),](#)* is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ [§ 1997e(a) ](#)[FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

[FN16.](#) The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*[Flanagan,](#)* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> FN17. The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> FN18. There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:

(1) there was no evidence that administrative remedy was available to inmate;

(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;

(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;

(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;

(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** ⬅ **2547.1**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2547.1 k. In general. Most Cited Cases
Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** ⬅ **25**

170A Federal Civil Procedure
  170AI In General
    170AI(B) Rules of Court in General
      170AI(B)1 In General
        170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** ⬅ **2547.1**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A** 🗝 **657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45** 🗝 **62**

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A** 🗝 **657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A** 🗝 **2546**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se plaintiff's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78** 🗝 **1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310** 🗝 **317**

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310** 🗝 **313**

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 ☞ 1319

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[10] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

[12] Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

[13] Prisons 310 ☞ 192

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** ☞ **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** ☞ **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** ☞ **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H 🔑 1546

350H Sentencing and Punishment
　350HVII Cruel and Unusual Punishment in General
　　350HVII(H) Conditions of Confinement
　　　350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A 🔑 2491.5

170A Federal Civil Procedure
　170AXVII Judgment
　　170AXVII(C) Summary Judgment
　　　170AXVII(C)2 Particular Cases
　　　　170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 🔑 1355

78 Civil Rights
　78III Federal Remedies in General
　　78k1353 Liability of Public Officials
　　　78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 🔑 1358

78 Civil Rights
　78III Federal Remedies in General
　　78k1353 Liability of Public Officials
　　　78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A 🔑 2491.5

170A Federal Civil Procedure
　170AXVII Judgment
　　170AXVII(C) Summary Judgment
　　　170AXVII(C)2 Particular Cases
　　　　170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23] Civil Rights 78 🗝 1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A 🗝 2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.FN1 They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also* *Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving**349 at the NCCC,FN2 plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.FN3 (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.<sup>FN4</sup> (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.<sup>FN5</sup> (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,<sup>FN6</sup> informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.) <sup>FN7</sup> Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> **FN8.** Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352** an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> **FN9.** Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> **FN10.** Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has any bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement these decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post-*Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at \*11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

### i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994); *see also Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

### ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

> FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

> FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve [plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003)* ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009)* ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004)* ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna, 386 F.3d at 437* (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007)* ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna, 386 F.3d at 437*)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)


### V. CONCLUSION


For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.


SO ORDERED.


E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his

inability to timely file several motions, and to permit the matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

being seen on several occasions by a Clinton County Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716,* 720 (2d Cir.1990). With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)* (*quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)*).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103, 97 S.Ct. at 290* (*quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)*).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. See *Estelle, 429 U.S. at 103, 97 S.Ct. at 290.* The essence of an improper medical treatment claim lies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

in proof of "deliberate indifference to serious medical needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' *Id.* (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) *(citation omitted )*. Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 *(citation omitted )*.

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious

enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 *(citation omitted )*. Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi[FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell *(Def. ['s] Ex. A, P. 4 )*.

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar *(Qudsi Aff., P. 2)*. Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication *(Def. ['s] Ex. B, P. 1)*.

**\*4** Between January 20, and April 12, 1999, LaFave made

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

no complaints concerning his alleged mouth pain. On April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi

examined his right lower molar and noted cavitation with decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Joseph P Paul GUARNERI, Plaintiff,
v.
Lt. James HAZZARD; Cpl J. Cronk; Deputy Paul
Marsh, Jr.; Deputy Grippin; Deputy Howland; Frederick
C. Lamy, Commissioner; Francis T. Sullivan,
Commissioner; Deputy Mace; John Doe, Deputy; and
Dr. Weitz, Defendants.
**No. 9:06-CV-0985.**

Feb. 27, 2008.

Joseph P Paul Guarneri, Elmira, NY, pro se.

Girvin & Ferlazzo, P.C., Gregg T. Johnson, Esq., Jacinda
Hall Conboy, Esq., Scott P. Quesnel, Esq., of Counsel,
Albany, NY, for Defendants Hazzard, Cronk, Marsh,
Grippin, Howland, and Mace.

O'Connor, O'Connor, Bresee & First, P.C., Justin O.
Corcoran, Esq ., of Counsel, Albany, NY, for Defendant
Weitz.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Bruce J. Boivin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendant Sullivan.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge David R.

Homer, duly filed on the 6th day of February 2008.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. Sullivan's motion to dismiss (Docket No. 43) is granted
and that the amended complaint is dismissed in its entirety
as to her.

3. Dr. Weitz's motion to dismiss (Docket No. 19) is:

   a. Granted as to his lack of personal involvement with
the confiscation of the knee brace;

   b. Denied as to his lack of personal involvement in
Guarneri's neck, back, and mental health treatments;

   c. Denied as to Guarneri's back and neck injuries
sustained in 2003; and

   d. Granted as to Guarneri's back and neck injuries
sustained in 2000.

4. The amend complaint is dismissed without prejudice as
to defendants Lamy and John Doe.

5. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

    FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Joseph Paul Guarneri ("Guarneri"), presently an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] six Schoharie County employees ("County defendants"), two New York State Commissioners ("State defendants"), and one physician, violated his First and Eighth Amendment rights while Guarneri was incarcerated at the Schoharie County Correctional Facility ("Schoharie"). Am. Compl. (Docket No. 13). Presently pending are the motions for summary judgment of the physician (Docket No. 19) and the State defendants[FN3] (Docket No. 43) pursuant to Fed.R.Civ.P. 12(b)(6). Guarneri opposes both motions. Docket No. 46. For the following reasons, it is recommended that the physician's motion to dismiss is granted in part and denied in part and that the State defendant's motion be granted.

    FN2. Guarneri initially named twelve defendants, two of whom were dismissed by an order dated March 6, 2007 (Docket No. 15) and one who remains unidentified. State Defs. Memorandum of Law (Docket No. 43, Pt. 4) at 3 n. 2.

    FN3. Defendant Lamay has not been served or otherwise appeared in this action. See State Defs. Memorandum of Law at 3 n. 5. Likewise, defendant John Doe has neither been served nor further identified. More than 120 days have elapsed since the amended complaint was filed. Accordingly, it is recommended that the amended complaint be dismissed without prejudice as to both defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

**I. Background**

The facts are related herein in the light most favorable to Guarneri as the nonmoving party. See subsection II(A) infra.

Guarneri was incarcerated at Schoharie from June 6 to August 2006 for a parole violation. Am. Compl. at ¶ 2. On June 16, 2006, Guarneri represented himself at his preliminary hearing. Id. at ¶ 2. Guarneri claims that the Schoharie law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system which delivered requested material, if at all, after the date of the preliminary hearing. Id. These deficiencies "infringed and undermined [Guarneri's] constitutional rights." Id. Additionally, Guarneri claims that his time in the library was "intentionally and unreasonably limited ...." Id. at ¶ 42. Guarneri also contends that defendant Hazzard failed to copy the appropriate Penal Law sections regarding the period of punishment and failed to provide him with the correct case law pertaining to his litigation. Id. at ¶ 45.

**\*2** Besides his legal difficulty, Guarneri also arrived at Schoharie in grave pain due to pre-existing injuries including herniated discs in his neck and lower back, torn ligaments in his knee, Post-Traumatic Stress Disorder (PTSD), bipolar disorder, and depression. Id. Guarneri claims that on July 21, 2006, he was "denied ... emergency medical care by [defendants] Weitz and [ ] Hazzard for a [knee] give-way episode...." Id. at ¶ 22. Furthermore, Guarneri contended that upon receiving medical attention in the emergency room, hours later and after suffering severe pain, the treatment was wholly inadequate. Id. at ¶ 32. Guarneri also makes reference to incidents occurring in 2000 and 2003 which resulted in his herniated discs, alleging that at the time of the incident defendants Marsh and Hazzard delivered inadequate medical care that was further perpetuated by defendants Weitz and Hazzard with their decision to prohibit Guarneri from receiving a back brace. Id. at ¶ 30. Additionally, Guarneri contends that defendants Hazzard, Crook, Marsh, Grippin, Howland, Mace, John Doe, and Weitz all colluded against him "by not letting [Guarneri] speak to mental health counselors when [he was suffering from] mental health episodes ...."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

*Id.* at ¶ 35. Lastly, Guarneri contends that after arriving at Elmira Correctional Facility in August 2006, defendants Hazzard, Mace, and John Doe deliberately interfered with his medical treatment by precluding him from wearing the hinged knee brace which had subsequently been provided to him at Schoharie. *Id.* at ¶ 2.

In response to defendants repossessing his knee brace, Guarneri timely filed a grievance. *Id.* at ¶ 22, 25. Guarneri contends that the State defendants failed to respond to this grievance because they were acting in concert with the County defendants, "deliberately and intentionally tak[ing] advantage of ... [Guarneri]." *Id.* at ¶ 25. The State defendants lack of communication led Guarneri to the conclusion that "resort to an administrative remed[y] would be clearly futile ...." *Id.*

Additionally, Guarneri alleges that defendant Hazzard "deliberately and intentionally [attempted to] stop" Guarneri from practicing Catholicism while he was incarcerated. *Id.* at ¶ 36. Guarneri contends that "defendant ... has known for years that [he] has been Catholic and has known the Rev. Ferenezy is not of the Catholic faith;" therefore, Hazzard's actions of arranging meetings between the two when Guarneri requested religious counsel amounted to defendants "tr[ying] to force a different religion on [Guarneri] ... den[ying him] the opportunity to see clergy and Catholic Religious Advisors when requested." *Id.* at ¶ 39.

## II. Discussion

Guarneri asserts two causes of action under the First Amendment that he has been denied (1) meaningful access to the courts and (2) his religious freedom. Additionally Guarneri claims deliberate indifference to a serious medical need in violation of the Eighth Amendment because defendants (1) did not allow him to keep his hinged knee brace upon arrival at Elmira Correctional Facility, (2) provided delayed and inadequate emergency treatment on July 26, 2006, (3) received inadequate care at the time of his disc herniations in 2000 and 2003, and (4) was denied proper medical care when defendants refused to order him a back brace. The physician, Dr. Weitz, moves for summary judgment on the grounds that (1) there was no personal involvement, (2) the amended

complaint fails to state a claim for deliberate indifference to serious medical needs, (3) the amended complaint is barred by res judicata and collateral estoppel, and (4) the medical claims relating to Guarneri's back are barred by the statute of limitations [FN4] [FN5] Defendant Sullivan contends dismissal is appropriate because there was no personal involvement.

> FN4. Dr. Weitz advances this valid claim expressly, however briefly, in a footnote in his memorandum of law. Weitz Mem. of Law (Docket No. 19, Pt. 3) at 15 n. 2.

> FN5. Der. Weitz also advances the claim that Guarneri failed to state a valid pendent state law claim. However, the amended complaint fails to allege any pendent state law claims. Thus this argument need not be addressed.

## A. Legal Standard

*3 Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Personal Involvement

Both defendants contend that Guarneri has failed sufficiently to allege their personal involvement.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*4** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Despite Guarneri's submission of an amended complaint, he has failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at Elmira Correctional Facility. Guarneri only references defendants Hazzard, Mace, and John Doe when discussing the events surrounding the confiscation of his knee brace. Am. Compl. at ¶ 19. Thus Guarneri fails to allege any facts indicating that Dr. Weitz was personally involved in those events.

However, Guarneri has contended that Dr. Weitz "denied [Guarneri] appropriate mental health care by not letting [him] speak to mental health counselors ..." and "refused [to] prescribe treatment for (herniated disk) in [sic] the lower back and neck [FN6] ... based on non-medical concerns like cost." Am. Compl. at ¶¶ 35, 30. These allegations specifically identify Dr. Weitz as a participant in the alleged medical indifference he suffered. Thus, Guarneri has succeeded in alleging facts, indicating that Dr. Weitz was personally involved in his medical care.

FN6. This allegation pertains solely to the neck and back injuries sustained in 2003. Those injuries occurring in 2000 have been dismissed as barred by the statute of limitations. *See infra* at subsection II(E).

Additionally, Sullivan has contended that Guarneri fails to allege her personal involvement. Guarneri alleges that the "State acted in concert with [County] defendants by not answering appeals of grievances submitted by [Guarneri] in a timely manner ...." Am. Compl. at ¶ 25. However, failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation." *Abbas v. Senkowski,* No. 03-CV-129 (GLS/DRH), 2005 WL 2179426, at *2 (N.D.N.Y. Sept. 9, 2005). Additionally, Sullivan may not be held personally liable solely because of his supervisory position. Moreover, Guarneri does not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

allege the creation or execution of an unconstitutional policy or negligent supervision. Thus, Guarneri's conclusory assertions are insufficient to provide a factual basis to support the personal involvement of Sullivan.

Therefore, it is recommended that Dr. Weitz's motion to dismiss be granted as to his involvement in the confiscation of the knee brace but denied with respect to his involvement in Guarneri's neck, back, and mental health treatments. Additionally, it is recommended that Sullivan's motion to dismiss be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

*5 " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or

treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir.2003) (citing Chance, 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. Id . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-1089 (GLS/RFT), 2006 WL 681223 at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v.. Coughlin, 99 F.3d 550, 553 (2d Cir.1996).

### 1. Knee

Guarneri may have offered evidence sufficient to conclude that the knee injury he sustained was serious. Generally, knee injuries have been "insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." Johnson v. Wright, 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered as a result of a basketball injury was not a serious medical need) (quoting Moody v. Pickles, No. 03-CV-850 (DEP), 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion" which did not render plaintiff immobile was not a serious medical need); see also Williamson v. Goord, No. 02-CV-521(GLS/GHL), 2006 WL 1977438, at *9, 14, 16 (N.D.N.Y. July 11, 2006) (holding that a prisoner's knee injuries including arthrosis, degenerative joint disease, and partially torn anterior cruciate ligament ("ACL"), did not constitute "death or degeneration, or [constitute the appropriate level of] extreme pain

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

[contemplated by] the law").

**\*6** In this case, it is unclear how significantly the deprivation of Guarneri's knee brace affected his mobility as he has subsequently indicated his ability to ambulate. Docket No. 46 at 3. However, construing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. *Id.* Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 2. Mental Health

Guarneri also alleges that he suffered from and received inadequate medical treatment for PTSD, bipolar disorder, and depression. "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, considering all of Guarneri's various complaints concerning his mental health, it is clear that he has alleged facts sufficient to provide relief as to whether he suffered a serious medical need as a result of his mental illnesses.

Moreover, Guarneri also contends that defendants have deliberately precluded him "from speaking to mental health counselors when hav[ing] mental health episodes ...." Am. Compl. at ¶ at 34-35. If proven, this constitutes

deliberate indifference to Guarneri's mental health needs. Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 3. Back

Guarneri alleges sufficient evidence to present a serious medical need. Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \*14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); *see also, Farraday v. Lantz,* No. 03-CV-1520 (SRU), 2005 WL 3465846, at \*5 (D. Conn. Dec 12, 2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need). Therefore, with regard to the 2003 back injury, Guarneri has alleged a serious medical need.

Additionally, Guarneri alleges that defendant Hazzard "deliberately and with malice denied adequate medical care ...." Am. Compl. at ¶ 23. Thus, construing these allegations in the light most favorable to Guarneri, he has alleged deliberate indifference to this medical need. Thus, it is recommended that defendant's motion on this ground be denied.

### D. Res Judicata/Collateral Estoppel

**\*7** "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (applying res judicata to a 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach in which later claims are barred if they "aris[e]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Id.*

Under the Full Faith and Credit Clause of the Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts located within the state. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81 (1984)). However, the bar of res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Id.; Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986). The Second Circuit has held that a plaintiff in a § 1983 action who is seeking damages will not be vulnerable to dismissal based upon res judicata, although, a similar plaintiff seeking injunctive relief will be. *Davidson,* 792 F.2d at 277-78; *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 30 (2d Cir.1986).

As a threshold matter, Dr. Weitz correctly notes that Guarneri's previous lawsuit, also filed in the Northern District of New York, is still pending. *See Guarneri v. Bates,* No. 05-CV-444 (GLS/DRH) (report-recommendation of magistrate judge pending final decision before district court). Because the previous action has not received an adjudication on the merits, Dr. Weitz cannot overcome the first prong of the analysis. Thus, it is recommended that Dr. Weitz's motion on this ground be denied without prejudice.

In the alternative, Dr. Weitz also raises the broader affirmative defense of collateral estoppel. "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (1980). Collateral estoppel is applicable:

> [I]f (1) there has been a final determination on the merits of the issue sought to be precluded; (2) the party against whom ... preclusion is sought has a full and fair opportunity to contest the decision ...; and (3) the issue sought to be precluded by the earlier suit is the same issue involved in the later action.

**\*8** *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted). The requirement of a full and fair opportunity to contest requires that the plaintiff "was fully able to raise the same factual or legal issues" in the prior litigation as asserted in the present case. *LaFleur v. Whitman,* 300 F.3d 256, 274 (2d Cir.2002).

However, it is clear that there has not been a final determination in the pending federal case and Dr. Weitz, again, cannot surmount the first prong of the test. Therefore, Dr. Weitz's motion should be denied without prejudice on this ground as well.

### E. Statute of Limitations

Dr. Weitz moves to dismiss Guarneri's Eighth Amendment allegations concerning inadequate treatment for his neck and back on the ground that they are barred by the statute of limitations. While there is no provision in § 1983, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a) (2003); *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,* 488 U.S. 235, 249-51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); N.Y. C.P.L.R. 214(2) (McKinney 2003).

Federal law governs the determination of the accrual date for purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues "when the plaintiff knows or has reason to know" of the harm. *Id.* (citations omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980). With regard to medical indifference claims, the statute of limitations in a § 1983 suit is derived from personal injury case law, not medical malpractice. *See e.g. Owens,* 488 U.S. at 251.

Here, Guarneri's initial complaint was filed on August 14, 2006. Compl. (Docket No. 1). Thus, claims relating to medical indifference occurring in 2000 are clearly outside

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

the three-year period. However, claims regarding deliberate indifference resulting in herniated discs occurring in 2003 may fall within the three-year statutory period depending on when in 2003 the conduct occurred. Therefore, claims relating to the second back injury in 2003 may present facts upon which relief may be granted depending on when in 2003 the claim is shown to have accrued. At this stage, liberally construing Guarneri's amended complaint, the allegations therein are deemed to assert that claim accrued after August 14, 2003.

Thus, Dr. Weitz's motion on this ground should be granted with regard to the neck and back injuries occurring in 2000 and denied with regard to the back injuries occurring in 2003.

### III. Conclusion

**\*9** For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Sullivan's motion to dismiss (Docket No. 43) be **GRANTED** and that the amended complaint be **DISMISSED** in its entirety as to her;

2. Dr. Weitz's motion to dismiss (Docket No. 19) be:

a. **GRANTED** as to his lack of personal involvement with the confiscation of the knee brace;

b. **DENIED** as to his lack of personal involvement in Guarneri's neck, back, and mental health treatments;

c. **DENIED** as to Guarneri's back and neck injuries sustained in 2003; and

d. **GRANTED** as to Guarneri's back and neck injuries sustained in 2000; and

3. The amended complaint be **DISMISSED** without prejudice as to defendants Lamy and John Doe.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Guarneri v. Hazzard
Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jeffery HAMM, Plaintiff,
v.
Richard HATCHER, Prison Health Services, and New
York City Department of Correction, Defendants.
**No. 05-CV-503 (KMK).**

May 5, 2009.

West KeySummary
**Civil Rights 78 ⚷ 1091**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in
General
        78k1089 Prisons
            78k1091 k. Medical Care and Treatment. Most
Cited Cases
An inmate stated a sufficient claim under § 1983 for
deliberate indifference to a serious medical need against
a prison doctor. The inmate was told that he would have to
wait for ten days for his "regular medication" when he first
entered the prison. The doctor knew that the inmate had
previously been taking the medication and the inmate
further alleged that the doctor knew he was "in recovery"
and wanted him make him suicidal. Further, the inmate
alleged that he suffered from withdrawal and his medical
record demonstrated that even after he returned to his
medication was nervous, anxious, and angry. 42 U.S.C.A.
§ 1983.

Jeffery Hamm, New York, NY, pro se.

Kimberly D. Conway, Esq., New York City Law
Department, Office of the Corporation Counsel, Bronx,
NY, for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiff Jeffery Hamm, pro se, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging
that the New York City Department of Correction
("DOC"), Prison Health Services ("PHS"), and DOC
psychiatrist Richard Hatcher ("Hatcher") (collectively,
"Defendants") violated Plaintiff's rights under the Eighth
and Fourteenth Amendments in connection with their
suspension and alteration of his antidepressant
medications. Defendants move to dismiss Plaintiff's
Second Amended Complaint for failure to state a claim,
pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated
herein, Defendants' motion is granted in part and denied in
part.

*I. Background*

*A. Facts*

For purposes of this Motion, the Court accepts as true all
facts alleged by Plaintiff in his Second Amended
Complaint, filed July 31, 2006.

Upon entering the custody of DOC in March 2002,
Plaintiff received antidepressant medications, including
"forty milligrams of Paxil and fifty milligrams of
T[ra]zodone." (Second Am. Compl. ("SAC") ¶ 6; Third
Unnumbered Exhibit to SAC ("Medical Records"), at first
unnumbered page ("Consent for Medication" form
indicating that on March 15, 2002, Plaintiff consented to
receive "Paxil 40mg PO QAM [orally, every morning]"
and "Trazodone 50mg PO QAM").) Plaintiff continued
taking these medications while detained at the Otis
Bantum Correctional Center ("OBCC") for one hundred
days. (SAC ¶ 6; Medical Records, at second unnumbered
page ("Progress Note" dated August 14, 2002, and signed
by "Roberto Caga-Anan, MD," indicating the location as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

"OBCC" and renewing Plaintiff's Paxil prescription at a dosage of "40mg").)

Plaintiff was subsequently transferred to the George Motchan Detention Center ("GMDC"), located at 15-15 Hazen Street, East Elmhurst, New York. (SAC ¶ 6.) At his "initial interview" upon arriving at GMDC, Plaintiff "was told by Doctor Richard Hatcher" that he "would have to wait ten days for [his] regular medication." FN1 (Id.) Plaintiff "protested but was told that was the facility policy." (Id.) After ten days elapsed, Plaintiff was "prescribed only half [of his] regular dosage of Paxil" and was "suffering from the side effects of withdrawal symptoms of Paxil [sic]." (Id.) Plaintiff "continually complained and requested [his] regular dosage," but did not receive it prior to being "transferred upstate." (Id.)

> FN1. Plaintiff's Second Amended Complaint identifies Hatcher as a "[p]sychiatrist" at GMDC. (SAC ¶ 3(a).) Defendants, in their motion papers, assert that "defendant 'Richard Hatcher' is not and has never been an employee of the Prison Health Services or [DOC]" (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") 1 n. 1); Plaintiff responds that Hatcher's signature appears "on copies from my medical record[s] ... three times" (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem."), at first unnumbered page). It appears to the Court, however, that the signature to which Plaintiff refers is that of "Richard Fletcher, NP." (Medical Records, at third-fourth unnumbered pages.) Regardless, the Court will assume for purposes of this motion that the individual at issue is named Richard Hatcher, and that he was a psychiatrist, as Plaintiff alleges, rather than a nurse practitioner. However, Defendants' counsel is requested to provide documents and other information to Plaintiff that identify the person who signed the relevant medical documents. These materials are to be provided to Plaintiff within thirty days of the date of this Opinion and Order.

A September 19, 2002 "Progress Note" signed by "Sandra Hernandez, C.S.W." indicates that Plaintiff had arrived at GMDC by that date.FN2 The note stated: "Social Work. Pt. assigned & seen this P.M. Psychosocial & C.T.P. done."

(Medical Records, at third unnumbered page.) According to an October 25, 2002 Progress Note, allegedly signed by Hatcher, Plaintiff stated: " 'I'm getting nervous. I don't want to snap and get into more trouble. I get angry easily. Could you raise my Paxil?' " (Id.) The Progress Note indicated that Plaintiff "express[ed] concern about experiencing anxiety[,] anger[, and] possible loss of temper [and] control," and concluded that Plaintiff "will continue ... current regiment [sic] and add Risperidone 1mg PO BID [twice a day] for impulse control [and] depression." (Id.) According to a November 11, 2002 Progress Note, also allegedly signed by Hatcher, Plaintiff stated: " 'I need the Paxil raise[d] to 40mg in the morning. And I'm doing OK [with] the rest of the medicine.' ... 'I need to raise the Paxil because that's my regular dose. I need to stay more calm during the day.' " (Id. at fourth unnumbered page.) The Progress Note ended by listing Plaintiff's medications, stating that a physician "will give [Plaintiff] ... Paxil 40mg PO QAM for depression and anxiety." (Id.) In this notation, the words "Paxil 40mg PO QAM" were preceded by an arrow pointing upward. (Id.)

> FN2. Accompanying the Progress Note is the date and the notation "C-73," which indicates GMDC. (Defs.' Mem. 2.)

**\*2** A form dated December 31, 2002 stated that Plaintiff had complained to the mental health clinic that his "psych medication expir[ed] 2 w[ee]ks ago without renewal," saying that "[he] ha[d] been taking these medication [sic] [for] 2 y[ea]rs[;] now everything is messed up." (Id. at sixth unnumbered page.) According to the form, Plaintiff was "previously on Risper[idone] 3 mg QHS[, at bedtime] [,] Trazodone 50 mg QHS[, and] Paxil 20 mg QAM." (Id.) The form stated: "Please evaluate for continuation of meds." (Id.) A Progress Note dated January 3, 2003, and initialed "L.G." for "Lyubov Gorellk, MD," indicated that Plaintiff's Paxil dosage would be set to "20mg bid." (Id. at fifth unnumbered page.)

According to the Second Amended Complaint, Plaintiff's inability to receive his regular dosage of Paxil "further [ex]acerbated [his] condition while on trial[,] causing [him] to take a plea instead of going to trial." (SAC ¶ 6.) Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

sentenced to three to six years' imprisonment. (First Unnumbered Exhibit to SAC (*People v. Hamm,* No. 7840/01 (N.Y.App.Div. Apr.5, 2005) ("App.Div.Order"), at 12.) Plaintiff later "attempted to withdraw [his] plea on ... grounds" that he was impaired by his withdrawal from medication, "but was denied." (SAC ¶ 6.)

The Appellate Division affirmed the denial of Plaintiff's motion to withdraw his guilty plea, stating: "The record establishes that [Plaintiff's] plea was knowing, intelligent and voluntary, and it fails to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (App. Div. Order 12 (internal citations omitted).) The Appellate Division added that at his plea allocution Plaintiff "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and the court stated that the lower court "relied on its own recollection of [Plaintiff's] lucidity at the time of the plea" in denying Plaintiff's motion to withdraw his plea. (*Id.* 12-13.) Plaintiff's application for leave to appeal to the New York Court of Appeals was denied. (Second Unnumbered Exhibit to SAC (Cert. Denying Leave, dated June 18, 2005).)

Plaintiff alleges that Hatcher, knowing that Plaintiff was "in recovery," "endangered [Plaintiff's] safety as well as the safety of other inmates in an attempt to make [Plaintiff] suicidal." (SAC ¶ 6.) Plaintiff contends that Defendants "disregard[ed]" his "obvious medical condition" and "serious medical need," in violation of the Eighth Amendment, and "knew of and disregarded the risk of side effects of medication," with "[d]eliberate indifference," in violation of the Fourteenth Amendment. (*Id.*)

*B. Procedural History*

**\*3** Plaintiff filed suit on May 17, 2004, in the Northern District of New York. The action was transferred to the Southern District of New York on January 14, 2005. Then-Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend. Plaintiff filed an Amended Complaint on March 28, 2005. The case was subsequently reassigned to Judge Colleen McMahon. Plaintiff filed his Second

Amended Complaint on July 31, 2006. The case was reassigned to this Court on August 6, 2007. Plaintiff, who by this time had completed his prison term, moved for a default judgment on December 6, 2007.[FN3] The Court denied Plaintiff's motion, and this motion to dismiss by Defendants followed.

> FN3. According to Plaintiff's submission to the Clerk of Court, dated August 8, 2007, as of that date he was "under arrest on a parole violation" and being held at a DOC facility in Manhattan. (Dkt. No. 19.) The New York State Department of Correctional Services website indicates that Plaintiff was paroled on March 20, 2007.

*II. Discussion*

*A. Standard of Review*

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). "When considering motions to dismiss the claims of plaintiffs proceeding pro se, courts in [the Second] Circuit ... construe the pleadings liberally[,] ... especially ... when dealing with civil rights complaints ...." *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

page

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted) (second alteration in Twombly). In *Bell Atlantic Corp. v. Twombly, see id.* at 554-63, the Supreme Court abandoned reliance on the oft-cited line from *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As the Court explained in *Twombly,* a literal application of *Conley'* s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly,* 550 U.S. at 561 (alteration in *Twombly* ). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("After careful consideration of the Court's [*Twombly* ] opinion ..., we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* (emphasis in original)).

## B. Plaintiff's Eighth Amendment Claim

**\*4** "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Yet not every lapse in medical care is a constitutional wrong." *Id.* "Rather, a prison official violates the Eighth Amendment only when two requirements are met." *Id.* (internal quotation marks omitted).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (internal citations and quotation marks omitted); *see also Farmer v. Brennan,* 511 U.S. 825, 844-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280; *see also Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Salahuddin,* 467 F.3d at 280 (quoting *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003)) (second alteration in *Salahuddin* ).

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

harm must be substantial and the official's actions more than merely negligent." *Id.* (internal citations omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) ("[T]he mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.").

**\*5** However, the Eighth Amendment does not apply to individuals who are in pre-trial detention at the time of the incidents of which they complain. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) ("Because as a pre-trial detainee [plaintiff] was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply."); *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999) ("[T]he Eighth Amendment's protection does not apply 'until after conviction and sentence' ...." (quoting *Graham v. Connor,* 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))).

The Second Amended Complaint, construed liberally, does not allege any violation of Plaintiff's rights occurring after his conviction. Instead, it focuses exclusively on alleged deprivation of appropriate medication during Plaintiff's pretrial detention at GMDC, specifically alleging that Plaintiff "never received [his regular dosage of Paxil] before [being] transferred upstate" (SAC ¶ 6), i.e., before being convicted and sentenced. Thus, "[b]ecause ... Plaintiff was a pretrial detainee during his detention in [DOC custody], his challenge to the conditions of his confinement arises from the substantive component of the Due Process Clause of the [Fourteenth] Amendment and not from the cruel and unusual punishment standards of the Eighth Amendment," *Iqbal,* 490 F.3d at 168, and Plaintiff's Eighth Amendment claim is dismissed. *See Bennett v. Falcone,* No. 05-CV-1358, 2009 WL 816830, at \*6 n. 9 (S.D.N.Y. Mar. 25, 2009) ("While a convicted prisoner's right to medical assistance stems from the Eighth Amendment's ban on cruel and unusual punishment, the right of a pretrial detainee to medical care arises under the Due Process Clause of the Fourteenth Amendment .").

*C. Plaintiff's Fourteenth Amendment Claim Against Hatcher*

"The rights of one who has not been convicted are

protected by the Due Process Clause; and while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.; see also Cuoco,* 222 F.3d at 106 (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment").

The Second Circuit has noted that while "the Eighth Amendment ... standard for assessing deliberate indifference is a subjective one, requiring a determination as to whether the official knew of the risk to an inmate's health or safety[,] ... the Supreme Court has not stated whether the same standard should be applied in the due process context." *Weyant,* 101 F.3d at 856. In *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990), the Second Circuit "used an objective standard, requiring determination of what the official knew or should have known," *Weyant,* 101 F.3d at 856, holding that "a jury could find that [a doctor's] failure to diagnose [a pretrial detainee's] alcohol withdrawal constituted deliberate indifference," *Liscio,* 901 F.2d at 277. Notwithstanding this potential discrepancy, several district courts within the Circuit have stated that the analysis of a deliberate indifference claim is the same under the Due Process Clause as under the Eighth Amendment. *See Mitchell v. Prison Health Servs., Inc.,* No. 07-CV-8268, 2008 WL 5069075, at \*3 (S.D.N.Y. Nov.20, 2008); *Jones v. Artuz,* No. 01-CV-4652, 2006 WL 2390267, at \*3 (S.D.N.Y. Aug.17, 2006); *Fuentes v. Parks,* No. 03-CV-2660, 2005 WL 911442, at \*4 n. 7 (S.D.N.Y. Apr.18, 2005).[FN4]

FN4. The Second Circuit has noted that "[u]nder either standard, the state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant,* 101 F.3d at 856.

*1. Seriousness of Alleged Deprivation of Medical Care*

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

**\*6** Defendants contend that "Plaintiff cannot show that the alleged temporary delay in defendant's provision of medication to plaintiff or the reduction in dose of plaintiff's Paxil prescription was objectively sufficiently serious" to state a Fourteenth Amendment due process claim. (Defs.' Mem. 4.) According to Defendants, Plaintiff must show that the alleged delay or reduction "caused a condition of urgency that could result in degeneration or extreme pain," but fails to "allege that he suffered any pain or physical harm" at all. (Id. 5.) The Court concludes that at least the alleged ten-day deprivation of all medication cannot, as a matter of law, be dismissed at this stage as insufficiently serious to invoke due process protection.

"[M]edical conditions[ ] may be of varying severity. The standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998). "A prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery. But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment." Id.; see also Harrison, 219 F.3d at 136-37. The Second Circuit has observed that other circuits have considered "[f]actors ... includ[ing] '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain,' " Chance, 143 F.3d at 702 (third alteration in original), and has stated that such factors, "while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one," id. at 703. "[I]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining seriousness at the pleading stage." Id. at 702-03 (internal quotation marks omitted).

In his Second Amended Complaint, Plaintiff claims that when he arrived at GMDC, Hatcher allegedly told him that he "would have to wait ten days for [his] regular medication," despite Plaintiff's protests and despite the fact that Plaintiff, as Hatcher knew, was "in recovery." (SAC ¶ 6.) By the time that Plaintiff was given his medications (including a lower dose of Paxil), he was "suffering from the side effects of withdrawal symptoms of Paxil [sic]." (Id.) It is true that Plaintiff does not explain what the "side effects" or "withdrawal symptoms" were, and though he claims that Hatcher "attempt[ed] to make [him] suicidal," he does not allege that he actually had any suicidal thoughts. (Id.) However, reading the exhibits attached to the Second Amended Complaint in the light most favorable to Plaintiff, the Court deems Plaintiff to have alleged that as of October 25, 2002, he was " 'nervous,' " " 'g[o]t angry easily,' " and was "concern[ed] about experiencing anxiety." (Medical Records, at third unnumbered page.) By this time, Plaintiff had been at GMDC for over one month, and-assuming that he began receiving medication ten days after his arrival-had been taking antidepressants, including a reduced dosage of Paxil, for most of that time. Taking as true Plaintiff's contention that his reduced dosage of Paxil caused his nervousness, anger, and anxiety as of October 25, 2002, it is reasonable to read his pleadings as alleging that he suffered similar (and ostensibly more severe) psychological and emotional effects arising from his complete "withdrawal" from all medication during the ten-day period following his transfer from OBCC to GMDC. See Cuoco, 222 F.3d at 106 (noting that "[c]ourts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need' "); Young v. Coughlin, No. 93-CV-262, 1998 WL 32518, at *4 (S.D.N.Y. Jan. 29, 1998) ("Even pain that is psychological in origin can constitute a serious medical need. The guarantee of the minimal standards of medical care to prisoners extends to treatment of psychological or psychiatric disorders.").

**\*7** The Court cannot say that Plaintiff's allegations of psychological suffering are "so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern," Chance, 143 F.3d at 702, and therefore cannot conclude at the pleading stage that Plaintiff's alleged subjection to ten days of withdrawal from antidepressants was consistent with adequate medical treatment. See id. at 703 ("The plaintiff ... has alleged that, as the result of the defendants' actions, he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly. It may become clear, at summary judgment or at some later stage in the litigation, that these claims are not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

adequately supported. But at the 12(b)(6) stage, we must accept the plaintiff's allegations as true and may not dismiss the case unless it is clear that it would be impossible for the plaintiff to make out a legally cognizable claim. Under this standard, the case before us should not have been dismissed."); *Tiggs v. City of New York,* No. 07-CV-7254, 2009 WL 602991, at *2 (S.D.N.Y. Feb.24, 2009) ("Although failure to treat an insect bite unto itself likely does not rise to the level of a constitutional violation, failure to timely treat a bite that appears seriously infected-as Plaintiff's bite may have been when he requested and was denied medical attention-could conceivably constitute such a violation.... [D]epending on the appearance of Plaintiff's alleged injury when he requested and was denied medical assistance, Plaintiff may be able to establish that his medical need was 'sufficiently serious' to satisfy the objective prong of the deliberate indifferen[ce] test." (footnote omitted)); *Laktas v. Health Prof'l Ltd.,* No. 03-CV-1374, 2007 WL 4379417, at *4, 12 (C.D.Ill.Dec. 12, 2007) (denying motion to dismiss claim that defendant doctors were "deliberately indifferent to ... serious medical conditions [including] ... bi-polar disorder," where plaintiff alleged that the doctors refused to renew his prescription for drugs to treat his bi-polar condition); *Hann v. Michigan,* No. 05-CV-71347, 2007 WL 894827, at *6 (E.D.Mich. Mar. 2, 2007) (R & R) (denying motion to dismiss where plaintiff alleged that "he had been prescribed ... an antidepressant, and that the medical care defendants knew this" but that they "nonetheless failed to provide him with [the antidepressant], despite his repeated protestations of his need for the medication," stating that "[t]here is no question that depression constitutes a serious medical condition," and noting that though "it may be the case that ... [plaintiff] was no longer depressed at the time the medication was discontinued, [that] matter[ ] ... may not be considered in analyzing defendants' motion to dismiss"), *adopted by* 2007 WL 895056 (E.D.Mich. Mar.21, 2007) *and* 2007 WL 1565465 (E.D.Mich. May 29, 2007); *cf. Barnard v. Beckstrom,* No.07-CV-19, 2008 WL 4280007, at *16 (E.D.Ky. Sept. 17, 2008) (awarding summary judgment on deliberate indifference claim, citing doctor's affidavit "find[ing] no merit in the claim that the ten-day delay ... in getting [plaintiff's] change in dosage and time of administration of [a psychiatric medication] ... caused [plaintiff] to suffer any adverse ... consequences"); *Caldwell v. McEwing,* No. 00-CV-1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept.28, 2006) (awarding summary judgment on deliberate indifference claim where plaintiff had not established that her psychiatric

medication was a serious medical need).

*2. Deliberate Indifference*

**\*8** Defendants further argue that Plaintiff "makes no factual allegations to show that defendants were aware of facts from which one could infer that a substantial risk of serious harm existed because of the ten-day delay in plaintiff's receipt of medication, and the reduction in his Paxil prescription." (Defs.' Mem. 7.) In other words, Defendants argue, Plaintiff fails to properly allege that he was subjected to deliberate indifference.

The Court agrees that Plaintiff has failed to state a claim that Defendants were deliberately indifferent to Plaintiff's medical needs in connection with Defendants' alleged failure to provide Plaintiff with his full dosage of Paxil. This conclusion is the same regardless of whether the relevant issue is what Defendants subjectively knew about Plaintiff's medical needs or what they objectively should have known. The medical records annexed to the Second Amended Complaint indicate that on October 25, 2002, when Plaintiff asked to have his dosage of Paxil increased, Hatcher decided instead to continue with his existing dosage of Paxil and to add an additional medication, Risperidone, "for impulse control [and] depression." (Medical Records, at third unnumbered page.) The same records further indicate that on November 11, 2002, Hatcher *did* accede to Plaintiff's request to increase his dosage of Paxil to 40 milligrams each morning.[FN8] (*Id.* at fourth unnumbered page.) Later, on January 3, 2003, Plaintiff was prescribed 20 milligrams of Paxil twice daily, for a total of 40 milligrams per day. (*Id.* at fifth unnumbered page.) Even assuming-in light of Plaintiff's allegation that he "never received" his "regular" 40-milligram dosage of Paxil while in DOC custody-that this purported increase of Plaintiff's Paxil prescription after November 11 was never actually carried out, Plaintiff's unfulfilled demand for a larger dosage of Paxil represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference, particularly in light of the medical treatment (and prescriptions) he received at the time. *See Adams v. Perez,* No. 08-CV-4834, 2009 WL 513036, at *3 (S.D.N.Y. Feb.27, 2009) ("Plaintiff's Complaint indicates that she has received significant medical attention since her fall. After Plaintiff fell she was transported to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

prison's medical unit for care. She was admitted to the infirmary overnight and x-rays were taken of her injuries. Since being discharged from the infirmary, Plaintiff has received at least four prescriptions for her pain and seen [defendant doctor] on at least three occasions. Thus, it is clearly not the case that Defendants[ ] are ignoring Plaintiff's medical needs. Additionally, the two specific treatments Plaintiff requests ... constitute a disagreement regarding course of treatment, a situation that is not actionable under the Eighth Amendment. Thus, the Court finds that Plaintiff has not stated a claim against Defendants for deliberate indifference toward her medical needs." (internal citations omitted)); *Mitchell,* 2008 WL 5069075, at *5 ("[Plaintiff's] allegations [that a Mediport placed in his chest] ... should have been flushed more frequently and should have been removed[ ] amount to, at most, a claim for medical malpractice.... Generously construed, plaintiff's allegations might state a claim for negligence. But the complaint and affirmation do not allege sufficient facts to nudge plaintiff's claim that defendants acted with deliberate indifference to his serious medical needs across the line from conceivable to plausible."); *Hughes v. Pillai,* No. 07-CV-55, 2008 WL 723510, at *1 (W.D.Pa. Mar. 17, 2008) (granting motion to dismiss deliberate indifference claim where plaintiff "does not assert in his complaint that [defendant doctor] discontinued his psychiatric medication altogether, but merely that she substituted his benzo-class medication with another psychot [ro]pic medication"). Construing Plaintiff's pleadings in the light most favorable to Plaintiff, and drawing all inferences in his favor, the Court concludes that Plaintiff's allegations confirm that Hatcher was responsive to requests for increased medication and that any disagreement they may have had over the precise drugs to be administered (or the quantity of those drugs) is grounds at most for a claim of medical malpractice.[FN6]

FN5. As noted earlier, the Court is allowed to consider materials appended to, or incorporated into, the Amended Complaint. *See Leonard F., 199 F.3d at 107.*

FN6. The Court briefly notes that its conclusion on this issue-that Plaintiff fails to state a claim as to the reduction of Plaintiff's Paxil dosage from 40 to 20 milligrams-renders moot Defendants' argument that Plaintiff's Section 1983 claim on these grounds is barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (Defs.' Mem. 8-9.) In *Heck,* the Supreme Court held that in order to recover damages for harm caused by actions whose unlawfulness would render his conviction or sentence invalid, a Section 1983 plaintiff must show that that conviction or sentence had been called into question by issuance of a writ of habeas corpus or otherwise invalidated. This favorable-termination requirement applies to plaintiffs who are incarcerated at the time that they file their Section 1983 actions, regardless of whether they are later released. *See Gastelu v. Breslin,* No. 03-CV-1339, 2005 WL 2271933, at *4 (E.D.N.Y. Sept. 12, 2005) ("[Plaintiff] ... was still in prison when he initiated this § 1983 action. Because his challenge would necessarily imply the invalidity of his confinement, he is precluded from bringing an action under § 1983. The fact that he was released while his § 1983 action was pending does not alter the result."); *accord Rolle v. Connell,* No. 05-CV-991, 2005 WL 3077474, at *3 (N.D.N.Y. Nov. 16, 2005) (following *Gastelu*). Defendants argue that because "the purported 'consequence' alleged in the Second Amended Complaint of the modification in plaintiff's medication regime is that the reduction in his medication caused him to take a plea agreement," Plaintiff's claim therefore "represents nothing more than a collateral attack by plaintiff on his criminal conviction" and therefore is "prohibited" by *Heck.* (Defs.' Mem. 8-9.) Defendants are correct that Plaintiff, who was still serving his sentence when he filed this action, is barred from making any claim relying on alleged harm he suffered from entering a guilty plea. The Court's analysis of Plaintiff's claims therefore relies only on Plaintiff's allegation that Defendants' deliberate indifference caused him to suffer medical harm during his pretrial detention in DOC custody; this allegation alone, if proven, would not call into question the validity of Plaintiff's conviction and sentence.

**\*9** However, the Court cannot dismiss Plaintiff's claim that Defendants were deliberately indifferent to Plaintiff's need for medication during his first ten days at GMDC. Plaintiff alleges that Hatcher supposedly told him he would have to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

wait ten days for his "regular medication," indicating Hatcher's understanding that Plaintiff was previously taking certain drugs; Plaintiff further claims that Hatcher was aware that he was "in recovery," that Hatcher "attempt[ed] to make [him] suicidal," and that the reason given for the delay was not an assessment that Plaintiff would be better off without medication but rather that it was a GMDC "policy ." Together with Plaintiff's claims that he suffered from withdrawal and the evidence in Plaintiff's medical records that, even after returning to his medication, Plaintiff was nervous, anxious, and angry, these allegations suffice to state a claim that Hatcher was deliberately indifferent to Plaintiff's medical needs when he first arrived at GMDC. See *Chance,* 143 F.3d at 704 ("Crucially, [plaintiff] has ... alleged that [defendant dentists] recommended extraction not on the basis of their medical views .... This allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) ("It is ... possible that [plaintiff] could prove that [defendant nurse] acted with a sufficiently culpable state of mind when she aggravated his condition by allegedly taking away one of his crutches."); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (holding that "[f]rom the allegations of this *pro se* complaint, it is not beyond dispute that [plaintiff] will be unable to develop evidence to show that [defendant] officers were aware of his serious medical need for ... eye-glasses," where plaintiff alleged that one officer " 'checked with' [a] nurse [ ] who had seen [plaintiff's] medical documentation" regarding the glasses, and therefore "the complaint suffices to warrant discovery to ascertain whether ... the [defendant] officers were aware of [plaintiff's] serious medical needs").

*D. Plaintiff's Fourteenth Amendment Claims Against Other Defendants*

Defendants contend that Plaintiff's claim against DOC must be dismissed because DOC is not a proper defendant. Defendants are correct. "As an agency of the City of New York, the Department of Corrections ... is not a suable entity." *Green v. City of N.Y. Dep't of Corr.,* No. 06-CV-4978, 2008 WL 2485402, at *4 (S.D.N .Y. June 19, 2008). Plaintiff's claim against DOC is therefore dismissed.

In addition, although Defendants do not address Plaintiff's claim against PHS, other than to deny that Hatcher is or has ever been a PHS employee (Defs.' Mem. 1 n. 1), the Court concludes that Plaintiff's claim against PHS must also fail for lack of any allegation that PHS was involved in the violation of Plaintiff's rights. The Second Amended Complaint does not mention PHS at all other than to name it as a defendant, and it does not appear to the Court that any exhibits annexed to the pleading mention PHS. Thus, Plaintiff's claim against PHS is also dismissed. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).

**\*10** The Court finds it appropriate, however, to permit Plaintiff to amend his pleading one more time, so that he may allege, if warranted, claims against PHS and the City of New York ("City"). *See Myrie v. Calvo/Calvoba,* 591 F.Supp.2d 620, 629 (S.D.N.Y.2008) ("Given plaintiff's *pro se* status, it seems prudent to give him an opportunity to supplement his allegations, if he can, with specific facts tending to show ... deliberate indifference."); Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). The Court notes that the Second Amended Complaint alleges that Hatcher denied Plaintiff medication pursuant to a facility "policy," which could conceivably be grounds for a claim against PHS and/or the City pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff is therefore "granted leave to reassert his Fourteenth Amendment claim as against New York City itself, since his complaint clearly reflects an effort to assert a claim against the governmental entity in addition to [Hatcher]," but is also "cautioned that he must make clear the factual basis of any federal claim he is asserting against the City of New York, because the municipality can only be held liable if the violation complained of is the product of a municipal policy, custom or practice." *Green,* 2008 WL 2485402, at *4. Plaintiff may also choose, if appropriate, to renew his claim against PHS, provided that he can explain in his amended pleading how PHS was involved in the alleged deprivation of his rights. However, Plaintiff is strongly encouraged to review the materials Defendants' counsel will be sending Plaintiff, as such records might help Plaintiff accurately identify the medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

officials who signed the relevant documents and otherwise were responsible for the plausibly actionable medical decisions in this case.

### III. Conclusion

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. Plaintiff's Eighth Amendment claims are dismissed. Plaintiff's Fourteenth Amendment claim against PHS is dismissed without prejudice. Plaintiff's Fourteenth Amendment claim against DOC is dismissed with prejudice, and DOC is dismissed from this action. Plaintiff's Fourteenth Amendment claim against Hatcher is dismissed to the extent that it is based on allegations that Plaintiff received a lower dose of Paxil than he requested. Plaintiff's remaining claim, therefore, is that Hatcher violated Plaintiff's Fourteenth Amendment rights to adequate medical care by denying prescription medication to Plaintiff for a ten-day period after Plaintiff arrived at GMDC.

Plaintiff is also granted leave to amend his pleading, in order to substitute the correct party for Hatcher if warranted and to add claims against Prison Health Services and/or the City of New York, as described above; should Plaintiff choose to amend, he must file and serve his Third Amended Complaint by no later than sixty days from the date of this opinion. Plaintiff is directed to the pro se office (212-805-0175) for assistance in filing such a pleading.

**\*11** The Clerk of Court is respectfully directed to terminate the pending Motion (Dkt. No. 22), and to dismiss Defendants Prison Health Services and New York City Department of Correction from the case.

SO ORDERED.

S.D.N.Y.,2009.
Hamm v. Hatcher
Slip Copy, 2009 WL 1322357 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
William POLSON, Jr., Plaintiff,
v.
Brian FISCHER, Commissioner, New York State
Department of Correctional Services, et al., Defendants.
**Civil Action No. 9:08-CV-030 (TJM/DEP).**

June 16, 2010.

William Polson, Jr., Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Douglas J. Goglia, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff William Polson, Jr., a prison inmate who is
proceeding *pro se* and *in forma pauperis,* has commenced
this action under 42 U.S.C. § 1983 against the
Commissioner of the New York State Department of
Correctional Services ("DOCS") and several DOCS
employees, alleging deprivation of his civil rights. In his
complaint, which has twice been amended, Polson seeks
to recover damages for injuries sustained as a result of an
assault by his cell mate, alleging that the defendants failed
to protect him from harm despite their awareness of the
fellow prisoner's threats against him and denied him
proper treatment for his medical conditions which, while
pre-existing, were aggravated as a result of the attack.

Defendants have moved for dismissal of the operative

pleading now before the court. In their motion defendants
argue that plaintiff's claims are facially lacking in merit,
and additionally assert lack of personal involvement of
any of the defendants as a further basis for dismissal. For
the reasons set forth below, I recommend that defendants'
motion be granted, but that plaintiff afforded one final
opportunity to amend his complaint in order to state a
legally cognizable claim.

*I. BACKGROUND*[FN1]

> **FN1.** In light of the procedural posture of this
> case, the following recitation is drawn principally
> from plaintiff's amended complaint, the contents
> of which have been accepted as true for purposes
> of the pending motion. *See Erickson v. Pardus,*
> 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing
> *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,
> 127 S.Ct. 1955, 1965 (2007)); *see also Cooper
> v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734
> (1964). Portions of the background description
> which follow have been derived from the
> exhibits attached to plaintiff's complaint, which
> may also properly be considered in connection
> with a dismissal motion. *See Cortec Indus., Inc.
> v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d
> Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct.
> 1561 (1992); *see also Samuels v. Air Transp.
> Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

Plaintiff is a prison inmate entrusted to the custody of the
DOCS; at the times relevant to his claims Polson was
housed in the Upstate Correctional Facility ("Upstate"),
located in Malone, New York.[FN2] *See generally* Second
Amended Complaint (Dkt. No. 22). On April 27, 2007,
not long after plaintiff's transfer into Upstate, another
inmate was moved into his cell, which for approximately
thirty days had been occupied only by Polson. First
Amended Complaint (Dkt. No. 13) ¶¶ 9, 12.[FN3] Within a
short period of time plaintiff's new cell mate began to
threaten him with physical harm, saying that he would beat
him to the point where he "would not be able to walk." *Id.*
¶ 12. Plaintiff alleges that he informed an unidentified
DOCS corrections officer of the threats, but no action was
taken to protect him from his fellow inmate. *Id.* ¶¶ 13-14.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

FN2. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

FN3. While plaintiff's second amended complaint is the operative pleading and the object of defendants' motion, superceding all earlier filed complaints, *see Harris v. City of New York,* 186 F.3d 243,249 (2d Cir.1999), plaintiff's initial and first amended complaints are properly considered by the court when evaluating the plausibility of his claims. *Hale v. Rao,* No. 9:08-CV-1612, 2009 WL 3698420, at *3 n. 8 (N.D.N.Y. Nov. 3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.) (citation and internal quotation omitted).

Plaintiff was attacked by his cell mate on April 28, 2007, the following day. Second Amended Complaint (Dkt. No. 22) § 6. Plaintiff alleges that immediately prior to the incident his cell mate was under the influence of a hallucinogenic drug and "acting weird" and told Polson to "keep [his] Hand [sic] off his locker, [and] not to touch his bed." *Id.* During the course of the ensuing altercation plaintiff was punched in the face and chest, and kicked in the back and legs once he was on the floor, causing him to sustain injuries requiring medical attention. *Id.* Plaintiff alleges that it took corrections officers several minutes to arrive at his cell to assist him. *Id.* Plaintiff maintains that after the incident he complained to the proper authorities about his injuries, without realizing any relief.[FN4] *Id.*

FN4. It appears that as a result of the incident plaintiff was issued a misbehavior report accusing him of fighting and engaging in violent conduct, in violation of applicable prison rules. *See* Second Amended Complaint (Dkt. No. 22) at

pp. 19-21(attachment). Those charges were subsequently dismissed "in the interest of justice" following a disciplinary hearing to address the misbehavior report. *Id.*

Following the incident, plaintiff filed a grievance dated May 13, 2007 complaining of his injuries and the failure of prison officials to treat them. Second Amended Complaint (Dkt. No. 22) § 6 and Attachment. In that grievance plaintiff also complained that back and leg injuries made it difficult and painful for him to wash in a regular cell with a stand-only shower, and he requested as relief that he be assigned to a medical cell. *Id.*

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on January 9, 2008. Dkt. No. 1. Plaintiff's original complaint named DOCS Commissioner Brian Fischer, Upstate Superintendent Robert K. Woods, and fellow inmate A. Thomas as the defendants. *Id.* Upon initial review of plaintiff's complaint, by order dated January 24, 2008, Senior District Judge Thomas J. McAvoy granted plaintiff's request for *in forma pauperis* status but directed him to file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* Polson's failure to allege any wrongdoing on the part of Commissioner Fischer and Superintendent Woods.[FN5] Dkt. No. 3.

FN5. The other deficiencies cited included that the plaintiff had not submitted a complete complaint to the court, and he had not signed the complaint as required by Rule 11 of the Federal Rules of Civil Procedure. *See also* Local Rule 10.1(b)(2). Also noted was the fact that in the original complaint plaintiff began reciting the facts in support of his claims, but abruptly ended the factual recitation mid-sentence. *See* Complaint (Dkt. No. 1) p. 4. In a motion seeking reconsideration of Judge McAvoy's initial order, Dkt. No. 5, plaintiff attached what he claims to be the original complaint. That version included not only the missing facts section, but also a section that listed three different causes of actions on the same page. *See* Dkt. No. 5 (motion for reconsideration) at p. 8. The additional facts,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

however, do not cure the deficiency perceived by the court based upon the lack of facts revealing involvement of defendants Fischer and Woods in the violations alleged. *See* Dkt. Nos. 3 (Jan. 24, 2008 order) and 6 (Mar. 20, 2008 order).

Plaintiff filed a first amended complaint on September 2, 2008, in response to the court's directive.[FN6] Dkt. No. 13. That second pleading named Superintendent Woods and an unidentified "John Doe" corrections officer as the sole defendants, asserting claims based upon their failure to protect him from a known danger. Dkt. No. 13. On October 20, 2008, Senior District Judge McAvoy issued an order accepting the new pleading for filing and ordering dismissal of Commissioner Fischer from the action in view of plaintiff's failure to name him as defendant in his amended complaint. Dkt. No. 14.

> [FN6.] The first amended complaint was filed after the plaintiff was granted three extensions of the established deadline of April 19, 2008. *See* Dkt. Nos. 7, 8, 9.

In lieu of answering plaintiff's first amended complaint, on December 30, 2008 defendant Woods, the superintendent at Upstate at the time of the attack upon Polson, moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff's claims against him. Dkt. No. 18. In his motion, Woods argued simply that plaintiff's complaint, as amended, failed to establish a basis for finding that he was personally involved in the conduct giving rise to the constitutional violation alleged. *Id.*

Prior to the court's issuance of a decision in connection with defendant Wood's motion, plaintiff filed a second amended complaint on his own accord. Dkt. No. 22. In view of the fact that this latest complaint still listed Superintendent Woods as a defendant, I issued a report on June 23, 2009 recommending dismissal of plaintiff's claims against defendant Woods as set forth in the second amended complaint. Dkt. No. 23. That recommendation was adopted by Judge McAvoy by an order dated July 17, 2009; in that order, it was noted that plaintiff's second amended complaint would be deemed by the court to supersede and replace the prior complaints filed, and that defendant "John Doe, Correction Officer, Upstate

Correctional Facility", named in plaintiff's first amended complaint, would be dismissed as a defendant without prejudice since plaintiff's second amended complaint did not include him. Dkt. No. 25.

Plaintiff's second amended complaint, now the operative pleading before the court, names as defendants Superintendent Woods, who has already been dismissed from the action, as well as Commissioner of the DOCS, Brian Fischer; Corrections Officers Grant, Winston, and Gonyea; and Corrections Sergeant Mulaam.[FN7] Dkt. No. 22. In that pleading Polson asserts three claims, arguing that 1) defendants failed to protect him from danger of being attacked by his cell mate; 2) defendants failed to provide medical treatment for his injuries resulting from the attack; and 3) defendants failed to properly investigate and answer grievances that he filed regarding the incident. As relief, plaintiff's second amended complaint seeks compensatory damages in the sum of $100,000.

> [FN7.] As was noted above, plaintiff's claims against Commissioner Fischer were dismissed on October 20, 2008 in light of Polson's failure to name him in his first amended complaint. Dkt. No. 14. Defendant Fischer, however, is named as a defendant in plaintiff's second amended complaint and, accordingly, has signed and returned an acknowledgment of service form. Dkt. No. 27; *see also* Dkt. No. 25 (court order dated 7/17/2009 directing that the United States Marshal effectuate service upon the defendants, including Commissioner Fischer).

**\*3** Presently pending before the court is a motion filed on November 18, 2009 by the remaining defendants in the action, seeking dismissal of plaintiff's second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. Dkt. No. 35. In their motion, defendants argue that 1) subjectively, there is no allegation that defendants were aware of facts from which they could infer that plaintiff was exposed to a risk of serious harm; 2) plaintiff does not allege facts demonstrating the requisite degree of personal involvement by the defendants in the acts complained of; and 3) plaintiff's claim based upon the alleged failure of defendants to properly process grievances is not cognizable under 42

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

U.S.C. § 1983. Plaintiff has since provided an affidavit in response to defendants' motion. Dkt. No. 37.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted). When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

B. *Personal Involvement*

**\*4** In their motion, defendants challenge the sufficiency of plaintiff's allegations regarding defendants' roles in the constitutional deprivations alleged. Personal involvement of a defendant in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F .3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). The allegations of plaintiff's second amended complaint must be examined

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

against this backdrop in order to determine whether he has stated a plausible claim of personal involvement of the named defendants.

1. *Defendant Fischer*

Plaintiff's claim against defendant Fischer is apparently premised exclusively upon his role as the DOCS Commissioner; nowhere in plaintiff's complaint is there an allegation that defendant Fischer was an active participant in the conduct giving rise to Polson's claims, or that he was even aware of the relevant events.

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.") (citations omitted).

That is not to say that a supervisory official may never be held liable for a civil rights violation. Culpability on the part of a supervisory official can be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *overruled on other grounds sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937; *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*5** A thorough review of plaintiff's complaint and the attached documents fails to disclose any allegations of personal involvement on the part of defendant Fischer in the conduct giving rise to Polson's claims. The only reference in plaintiff's complaint to defendant Fischer is in that portion wherein the defendants are named; there, defendant Fischer's position is listed as "Commissioner, NYSDOCS". *See* Second Amended Complaint (Dkt. No. 22) § 3(a). Plaintiff's complaint is devoid of any allegations that defendant Fischer, as the DOCS Commissioner, was involved in the alleged constitutional violations, that he allowed an unconstitutional policy to occur, that he was negligent in the management of a subordinate, or that he failed to act on information indicating that unconstitutional acts were occurring. *See generally id.*

In sum, plaintiff's complaint does not disclose any basis on which to conclude that defendant Fischer was personally involved in any of the constitutional deprivations alleged to a sufficient degree to support a finding of liability on his part. Accordingly, I recommend dismissal of plaintiff's claims as against defendant Fischer, and, for the reasons set forth below, that he be afforded one final opportunity to replead. *See Anderson v. Duke,* No. 9:04-CV-0030, 2006 WL 2792735, at \*5 (N.D.N.Y. Sept. 27, 2006) (Mordue, C.J. and Peebles, M.J.) (dismissing plaintiff's claim against a prison superintendent defendant with leave to replead where plaintiff alleged the defendant merely overheard a conversation relating to the claims in his complaint); *see also Orraca v. McCreery,* No. 9:04-CV-1183, 2006 WL 1133254, at \*6 (N.D.N.Y. Apr. 25, 2006) (Hurd, D.J. and Peebles, M.J.) [FN8] (dismissing plaintiff's claim against a defendant with leave to replead where defendant was named in caption but not described in body of complaint); *Hucks v. Artuz,* No. 99 Civ. 10420, 2001 WL 210238, at \*5-\*6 (S.D.N.Y. Feb. 27, 2001) (granting a defendant who was named in the caption but not described in the body of an amended complaint motion to dismiss).

FN8. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

2. *Defendants Mullam, Grant, Winston and Gonyea*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

The allegations against the remaining defendants listed in plaintiff's second amended complaint are only marginally more informative than those against Commissioner Fischer. Aside from being identified as defendants in the portion of the second amended complaint listing the parties, none of the corrections officials now sued are named in the body of plaintiff's complaint setting forth the factual basis for his claims, nor is there any indication of their roles in the alleged failure to protect him from harm, provide him medical treatment, and process his grievances. From the attachments to plaintiff's complaint it appears that the sole basis for his claim of their involvement in the case is that each of them appears to have been on duty at the time of the assault on April 28, 2007, and that the misbehavior report issued to the plaintiff as a result of the incident was authored by defendant Gonyea.[FN9,FN10] *See* Second Amended Complaint (Dkt. No. 22) Attachments.

FN9. There are several attachments to the plaintiff's second amended complaint, the pages of which are not separately numbered, nor are these attachments each separately identified as an exhibit. The court will refer to these attachments by page number as filed with the court, even though they are unnumbered.

FN10. While the prison log appended to the plaintiff's complaint reads "4/29/07" in the portion encompassing the alleged attack, the times leading up to this shift change suggest that the date was written in error, and that the actual date should have been marked as April 28, 2007. *See* Second Amended Complaint (Dkt. No. 22) pp. 13-14 (attachment).

**\*6** Significantly, none of the defendants appear to have been on duty at 10:00 p.m. on April 27, 2007, when Polson allegedly alerted an unidentified corrections officer to the threats made by his cell mate. *See* First Amended Complaint (Dkt. No. 13) ¶ 13; Second Amended Complaint (Dkt. No. 22) p. 14 (attachment). Rather than identifying specific conduct on the part of each of the named defendants, plaintiff's complaint speaks in general terms, stating, for example, that "it took *them* several minutes, to get to [his] cell, ...", that he has "complained to the proper authorities about [his] injuries", and that he

was endangered "when the Upstate corrections placed another inmate in the cell with [him]." Second Amended Complaint (Dkt. No. 22) §§ 6, 7 (emphasis added). These allegations are insufficient to establish the requisite personal involvement on the part of the named defendants in the deprivations alleged in plaintiff's complaint.

As the foregoing suggests, I recommend a finding that plaintiff's claims against the remaining defendants in this action are subject to dismissal for lack of the showing of their personal involvement in the deprivations alleged.

*C. Merits Of Plaintiff's Claims*

While finding that plaintiff's claims against the main defendants in this action are subject to dismissal based upon their lack of personal involvement, I will nonetheless address the additional basis for defendants' motion, in which they also argue that none of the claims set forth in plaintiff's complaint contains merit.

*1. Failure To Protect*

The centerpiece of plaintiff's complaint is his claim that defendants failed to protect him from being assaulted by his cell mate, and thereby subjected him to cruel and unusual punishment, in violation of the Eighth Amendment.[FN11]

FN11. The amendment provides that "[e]xcessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII

Unquestionably, under the Eighth Amendment prison officials are required to take reasonable measures to guarantee the safety of inmates; this duty includes within it an obligation to protect prisoners from harm caused by fellow inmates. *Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 1976-77 (1994) (citations omitted); *see also Matthews v. Armitage,* 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (Homer, M.J.) (citing, *inter alia, Farmer* ). When examining a failure to protect claim under the

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

Eighth Amendment, a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer,* 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Matthews,* 36 F.Supp.2d at 124-25; *Coronado v. Lefevre,* 886 F.Supp. 220, 224 (N.D.N.Y.1995) (Scullin, J.). As can be seen, this analysis entails both an objective and subjective inquiry.

In objective terms, a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it denied him or her the "minimal civilized measure of life's necessities." *Dawes v. Walker,* 239 F.3d 489, 493-94 (2nd Cir.2001) (internal quotations and citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002). Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was incarcerated under conditions posing a substantial risk of serious harm. *Farmer,* 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Dawes,* 239 F.3d at 493; *Matthews,* 36 F.Supp.2d at 124-25.

**\*7** To demonstrate that defendants were deliberately indifferent to his or her plight, a plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his or her health and safety-"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Matthews,* 36 F.Supp.2d at 124-25. Significantly, "a prisoner cannot base a federal civil rights action brought under 42 U.S.C. § 1983 on claims of a negligent failure of state prison officials to protect him from injury at the hands of another inmate." *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 28 (2d Cir.1988).

It should be noted that claims involving the alleged failure of prison officials to protect an inmate from harm are also subject to review under the Fourteenth Amendment's substantive due process provision. Though the requisite mental state for establishing a Fourteenth Amendment failure to protect claim is somewhat unclear, it is at least apparent that to be legally cognizable under that provision,

the actions alleged on the part of a defendant must transcend mere negligence. *Davidson v. Cannon,* 474 U.S. 344, 347-48, 106 S.Ct. 668, 670 (1986) (lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent); *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663 (1986) (same); *Morales,* 842 F.2d at 30 (2nd Cir.1988) (section 1983 does not provide cause of action for negligent failure of prison officials to protect an inmate from injury); *AbdulMatiyn v. New York State Dep't of Corr. Servs.,* 871 F.Supp. 1542, 1546-47 (N.D.N.Y.1994) (Chin, J.) (citing *Morales* ).

Defendants interpret plaintiff's complaint as suggesting that the practice of double celling in a facility such as Upstate is inherently dangerous and runs afoul of the Eighth Amendment. Were this the sole basis for plaintiff's failure to protect claim it would be facially meritless, since the constitution does not contain a "one man, one cell" guarantee, nor does double bunking in and of itself violate the Eighth or Fourteenth Amendments. *Robinson v. New York State Dep't of Corr. Services,* No. 08-CV-911 (TJM/GJD), 2009 WL 3246818, at 13 (N.D.N.Y. Sept. 30, 2009) (McAvoy, C.J. and DiBianco M.J.) (citing *Bell v. Wolfish,* 441 U.S. 520, 542, 99 S.Ct. 1861, 1875 (1979)).

In an earlier iteration of his complaint, plaintiff went beyond the mere assertion that double bunking inherently violates the Eighth Amendment, alleging that he was subjected to threats of physical harm from at least two inmates and that he was moved out of two different cells as a result of those threats. *See* First Amendment Complaint (Dkt. No. 13) ¶ 9. Plaintiff further alleges that on April 27, 2007 he notified an unidentified officer that the cell mate who ended up attacking him on the following day had been threatening him, and requested to be moved out of that cell in order to protect his safety. [FN12] *Id.* ¶ 13. Plaintiff also alleges that he suffers from medical conditions that severely limit his mobility, making him more vulnerable to attack. First Amended Complaint (Dkt. No. 13) ¶ 17. These facts, taken together, could arguably establish that prison officials were more than merely negligent in failing to protect him from a known risk of harm. *See Simmons v. Lantz,* No. 3:04-CV-2180, 2007 WL 842008, at \*3 (D.Conn. Mar. 12, 2007) (holding that plaintiff's allegations that he informed a defendant captain that he felt threatened by his cell mate, but the defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

refused to move him to another cell, were sufficient to withstand a motion to dismiss); *see also Colman v. Vasquez,* 142 F.Supp.2d 226, 237 (D.Conn.2001) (holding that because plaintiff prisoner advanced factual allegations that a prison official knew the inmate faced a substantial risk of serious harm, and failed to take reasonable measures to abate that harm, his complaint should survive a motion to dismiss); *Sims v. Bowen,* No. 96-cv-655, 1998 WL 146409, *3 (N.D.N.Y. March 23, 1998) (Pooler, J.) (noting that, as plaintiff has alleged here, "an inmate must inform a correctional officer of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference").

> FN12. In his affidavit in opposition to defendants' motion, plaintiff asserts that the inmate who attacked him was inherently dangerous as a result of having taken "psych" drugs, a fact known to prison officials. *See* Polson Aff. (Dkt. No. 37) at p. 1.

**\*8** As was previously noted, the principal shortcoming of plaintiff's complaint is his failure to establish a nexus between his complaint regarding threats of violence on the part of his cell mate, the named defendants' awareness of those complaints and their corresponding failure to act. In the event that plaintiff chooses to avail himself of the opportunity to replead he must not only establish plausible claim that prison officials failed to protect him from a known danger, in violation of his Eighth Amendment rights, but additionally must set forth facts demonstrating the role of each of the named defendants in that failure. *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

2. *Medical Indifference*

In his second amended complaint Polson also complains of deliberate medical indifference, although the essence of that claim remains somewhat unclear. It appears from the second amended complaint and attached documents, including a grievance dated May 13, 2007, that Polson was denied medical treatment for his injuries following the assault, and requested but was denied a "medical cell" which would permit him to shower without having to stand up. Second Amended Complaint (Dkt. No. 22) § 9 and p.

17 (attachment).

Claims that prison officials have intentionally disregarded an inmate's medical needs also fall under the umbrella of the protection afforded by the Eighth Amendment. *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291. As with claims alleging failure to protect, those claims alleging medical indifference must satisfy both an objective and subjective requirement-that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970).

a) *Serious Medical Need*

In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U .S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also arise where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

**\*9** In this instance plaintiff asserts that he suffers from both a previous medical condition leaving him in a weakened physical state and the injuries he sustained from the assault. First Amended Complaint (Dkt. No. 13) ¶ 19. He further states that he has two other serious medical conditions, one in his right leg for which he wears a brace, and one in his back for which he also wears a brace.[FN13] *Id.* In the inmate grievance complaint attached to his second amended complaint plaintiff alleges that in his regular cell he must stand up in order to take a shower and as a result he is always in critical pain. Second Amendment Complaint (Dkt. No. 22) p. 17 (attachment). Standing up allegedly makes his pain worse and increases his risk of hurting himself while falling. *Id.* Based on these allegations, I find that plaintiff has plausibly alleged that he suffers from a serious medical need. *Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (Mordue, C.J. and Homer, M.J.) (holding that severe back pain, especially if long-lasting, can amount to a serious medical need); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need); *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (holding that "[s]evere back pain, especially if lasting an extended period of time, can amount to a serious medical need).

> FN13. Plaintiff has attached to his most recent complaint the results of magnetic resonance imaging ("MRI") testing, revealing that he has sought and received medical treatment for these injuries in the past, prior to the time of the

alleged assault. Second Amended Complaint (Dkt. No. 22) pp. 15-16 (attachment).

b) *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment medical indifference cause of an action a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach,* 103 F.Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

Turning to the specific allegations of plaintiff's complaint it appears that they are significantly deficient in terms of establishing that any of the named defendants were deliberately indifferent to his serious medical needs. Plaintiff notes in his first amended complaint that following the attack he was "seen by the facility nurse and pictures were taken of [his] injuries" immediately after the assault occurred. *See* First Amended Complaint (Dkt. No. 13) ¶ 16. Looking more broadly at the overall medical attention received, it appears from the attachment to plaintiff's second amended complaint that he did receive medical attention for his conditions, including of September and August of 2006. *See* Second Amended Complaint (Dkt. No. 22) pp. 14-15 (attachment).

**\*10** Plaintiff also alleges that prison officials wrongfully denied him a medical cell after the alleged attack, and that as a result his pre-existing medical conditions were aggravated. Second Amended Complaint (Dkt. No. 22) § 7, ¶ 2. Plaintiff's complaint, however, does not cite any doctor's orders directing that he be provided a medical cell. Accordingly, plaintiff has not sufficiently pleaded that any defendant named in his second amended complaint possessed the subjective reckless state of mind needed to permit a successful Eighth Amendment deliberate indifference claim. *See Fransua v. Vadlamudi,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

No-08-1715-PR, 2008 WL 4810066, (2d Cir.2008) (summary order) (dismissing prisoner plaintiff's claims of medical indifference where he did not allege that any defendants were aware of serious risks to which they allegedly subjected him) (cited in accordance with Fed. R.App. P. 32.1); *see also* Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996) (holding that "mere allegation that treatment at [prison facility] was insufficient [is not sufficient for a medical indifference claim] and that such a claim is, at best, a medical malpractice claim").

3. *Failure to Respond to Grievance*

Plaintiff's third and final cause of action asserts that defendants improperly processed his inmate grievances. In their motion, defendants assert that his claim is similarly legally deficient and not cognizable under section 1983.

It is well established that "[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." Shell v. Brzesniak, 365 F.Supp.2d 362, 370 (W.D.N.Y.2005). Accordingly, the refusal to process an inmate's grievance or failure to ensure that grievances are properly processed does not give rise to a claim cognizable under § 1983. Cancel v. Goord, No. 00 Civ.2043, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). I therefore recommend that plaintiff's third cause of action be dismissed, without leave to replead.

D. *Leave to Amend the Complaint*

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also* Mathon v. Marine Midland Bank, N.A., 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

Plaintiff commenced this lawsuit by filing the original complaint on January 1, 2008, accompanied by an application to proceed *in forma pauperis*. Dkt. Nos. 1 and 2. After a routine, initial review of the that complaint, the court dismissed the complaint for, among other reasons, failure to include any allegations against defendants Fischer and Woods. Decision and Order dated January 24, 2008 (Dkt. No. 3). At the time, plaintiff was advised that personal involvement of a named defendant is an essential element to be proven in any section 1983 action. *See id.* at p. 4. In deference to his *pro se* status, however, plaintiff was afforded an opportunity to filed an amended complaint; he was also instructed that the amended complaint must be a complete pleading and that it would supersede his original complaint in its entirety. *See id.* at p. 5.

**\*11** Instead of filing an amended pleading, plaintiff filed a motion for reconsideration with a proposed amended complaint attached. Dkt. No. 5. Plaintiff's motion for reconsideration was denied, the proposed amended complaint was rejected, and he was once again admonished that his complaint against Fisher and Wood, as well as other individually named defendants, must allege facts showing their personal involvement in the alleged constitutional violation. Decision and Order dated Mar. 20, 2008 (Dkt. No. 6) pp. 4-5. The court permitted plaintiff "one final opportunity to file an amended complaint [within thirty days] if he wish[ed] to avoid dismissal", again warning that the amended complaint must be a complete pleading and that it would supersede the original complaint in its entirety. *Id.* at p. 5. Plaintiff did not file an amended complaint as directed, despite having been granted several extensions of time. *See* Dkt. Nos. 7, 8, and 9. Instead, on July 3, 2008, he moved for appointment of counsel, or in the alternative, for voluntary dismissal of his action without prejudice and to be released from payment of all fees. Dkt. No. 10. Plaintiff's motion for appointment of counsel was denied, and plaintiff was advised that voluntary dismissal does not require a court order, but that he may not be released from payment of his filing fee. Dkt. No. 11. Before closing the action, the court granted plaintiff one further thirty-day extension of time to submit an amended complaint.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

Plaintiff subsequently filed an amended complaint on September 2, 2008. FN14 Dkt. No. 13. The only defendants named in that complaint were Robert K. Woods and John Doe Corrections Officer. Upon defendant Woods' motion to dismiss, the court dismissed the claims against him without leave to replead because plaintiff's complaint failed, once again, to allege any facts tending to show Woods' personal involvement in the constitutional violation alleged. Dkt. Nos. 23, 24. Before the court issued its report and recommendation that plaintiff's claim be dismissed, plaintiff filed the second amended complaint, the pleading to which the present motion is directed.

> FN14. Because plaintiff did not timely file the amended complaint, on September 2, 2008, the court issued a judgment dismissing the action. Dkt. No. 12. Plaintiff's amended complaint was filed that same day, and the judgement therefore was vacated. Dkt. no. 14.

As demonstrated by the foregoing, plaintiff not only has been instructed on at least three separate occasions that he must allege facts demonstrating personal involvement of the named defendants in the constitutional violations that he claims, but he was already previously extended a "final" opportunity to amend his complaint to state a viable section 1983 claim. Dkt. No. 6. Under the circumstances presented, it would appear to be well within the court's discretion to finally dismiss plaintiff's complaint. See, e.g., Smith v. Fischer, No. 9:07-CV-1264, 2010 WL 145292 (N.D.N.Y. Jan. 11, 2010) (Hurd, D.J. and Lowe, M.J.); Jones v. McMahon, No. 5:98-CV-034, 2007 WL 2027910 (N.D.N.Y. Jul. 11, 2007) (Lowe, M.J.).

Notably, however, all of plaintiff's amended complaints were filed before any discovery, and, indeed, prior to any answer being filed. Additionally, defendants do not claim any prejudice resulting from plaintiff's repeated amendments. While plaintiff has been forewarned that dismissal would eventuate and already has twice amended his complaint, it is obvious to the court that he is experiencing difficulty in formulating a proper pleading. In recognition of this fact, without in any way detracting from the gravity of the court's previous directives to plaintiff, and affording plaintiff the deference to which he

is entitled as a *pro se* litigant, Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594 (1972) (per curiam), I recommend that he be provided one last opportunity to submit an amended complaint alleging the personal involvement of the defendants named in this lawsuit. See Martin v. Gold, No. 1:05-CV-28, 2005 WL 1862116, at *3 (D.Vt. Aug. 4, 2005); Schoolfield v. Dep't of Corr., No. 91 Civ. 1691, 1993 WL 190272, at *1 (S.D.N.Y. May 28, 1993); see also Denny v. Barber, 576 F.2d 465, 470-471 (2d Cir.1978) (holding denial of leave to serve second amended complaint appropriate where plaintiff was on "the plainest notice of what was required" and failed to plead accordingly). As plaintiff previously has been advised, such an amended complaint, must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).

**\*12** I note that although the primary focus of plaintiff's complaints in this action has been upon defendants' failure to protect him from harm, he has also attempted to assert claims of deliberate medical indifference. While I have found that plaintiff's medical indifference claim set forth in his second amended complaint is subject to dismissal, I also recommend that plaintiff be granted one final opportunity to amend his complaint to both establish a plausible medical indifference claim and to identify any defendant who may have directly participated in the indifference to his serious medical needs. See Hale v. Rao, No 9:08-CV-612, 2009 WL 3698420, *5 (N.D.N.Y. Nov. 3, 2009) (Hurd, D.J. and Lowe, M.J.) (denying motion to dismiss where plaintiff alleged that a defendant doctor knew of a serious medical need and consciously disregarded that need by failing to acknowledge plaintiff's medical complaints); Beeks v. Reilly, No. 07-CV3865, 2008 WL 3930657, at *7 (E.D.N.Y. Aug. 21, 2008) (citation omitted) (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case ...."); Lloyd v. Lee, 570 F.Supp.2d 556, 559 (S.D.N.Y.2008) (finding that amended complaint plausibly alleged that doctors knew

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985476 (N.D.N.Y.)
(Cite as: 2010 WL 2985476 (N.D.N.Y.))

that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of prescribed course of treatment was ineffective, and declined to do anything to attempt to improve plaintiff's situation besides re-submitting MRI request forms).

IV. *SUMMARY AND RECOMMENDATION*

Having carefully considered defendants' motion in view of the formative stage of the proceedings at which it is made, I find that defendants are entitled to dismissal of plaintiff's claims both on the merits and based upon lack of personal involvement. I recommend, however, that plaintiff be given one final opportunity to amend his complaint to set forth plausible claims of defendants' failure to protect him from known danger and medical indifference to his serious medical needs. Any such amended complaint should specifically identify the defendants involved in each of the claimed deprivations and set forth facts sufficient for the court to determine that a plausible claim of personal involvement on the part of each of the named defendants has been stated.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED, that defendants' motion to dismiss plaintiff's second amended complaint (Dkt. No. 35) be GRANTED, with leave to replead as it relates to plaintiff's claims of failure to protect and deliberate medical indifference but without leave to replead with regard to plaintiff's cause of action for failure to properly process his grievances.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

*13 It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the

parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Polson v. Fischer
Slip Copy, 2010 WL 2985476 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2010 WL 2925362 (N.D.N.Y.)
(Cite as: 2010 WL 2925362 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
William POLSON, Jr., Plaintiff,
v.
Brian FISCHER, Commissioner, New York State
Department of Correctional Services, et al., Defendants.
**No. 08-CV-030.**

July 21, 2010.

*DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff, William Polson, Jr., an inmate in the custody of the New York Department of Correctional Services ("DOCS") and incarcerated at Upstate Correctional Facility ("Upstate CF"), brought this action *pro se* pursuant to 42 U.S.C. § 1983, alleging deprivation of his constitutional rights by Defendant Mullam, a Corrections Sergeant at Upstate CF, and Defendants Grant, Winston, and Gonyea Corrections Officers of the same facility.[FN1] Specifically, Plaintiff alleges that DOCS: (1) failed to protect him from an assault by his "cell-mate"; (2) denied him proper treatment for his medical conditions; and (3) failed to respond to his related grievances. Defendants moved to dismiss the second amended complaint pursuant to Fed.R.Civ.P. 12(b)(6).

> FN1. Although named as a defendant, the action was previously dismissed as to Brian Fischer.

Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Pebbles issued a Report and Recommendation recommending that "defendants' motion be granted, but

that plaintiff [be] afforded one final opportunity to amend his complaint to state a legally cognizable claim." Defendants have filed a timely objection to the report-recommendation.

**I. FACTS**

Plaintiff filed this action on January 9, 2008. *See* Docket No. 1. By Order dated January 24, 2008, the Court granted plaintiff's request for *in forma pauperis* status but dismissed the complaint because "as drafted, [the complaint] fail[ed] to state a claim upon which relief may be granted pursuant to § 1983." *See* Docket No. 3 at 5. "In light of plaintiff's pro se status," however, the court "afforded the opportunity to file an amended complaint" to avoid dismissal of the action." *See* Docket No. 3 at 5. Plaintiff was instructed to "set forth in his amended complaint all of the claims he intend[ed] to assert against the defendants and ... demonstrate that a case or controversy exist[ed] between the plaintiff and the defendants." *See* Docket No. 3 at 5. In this order, the Court explained the "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *See* Docket No. 3 at 4 (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotations omitted). The Court set forth the ways that Plaintiff could demonstrate the personal involvement of a supervisory defendant.

Plaintiff filed a first amended complaint on September 2, 2008. *See* Docket No. 13. Defendants moved pursuant to Rule 12(b)(6) to dismiss the Complaint on the grounds that Plaintiff's Complaint, as amended, failed to establish a basis for finding personal involvement by Defendants in the conduct giving rise to the constitutional violation. *See* Docket No. 18. Prior to the issuance of a decision on the motion, Plaintiff filed a second amended complaint. *See* Docket No. 22. Pursuant to an Order dated July 17, 2009, the Second Amended Complaint was deemed to supercede and replace all prior complaints. Presently before this Court is Defendants' motion to dismiss the Second Amended Complaint. United States Magistrate Judge David E. Peebles issued a Report and Recommendation recommending that "defendants' motion be granted, but

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2925362 (N.D.N.Y.)
(Cite as: 2010 WL 2925362 (N.D.N.Y.))

that plaintiff [be] afforded one final opportunity to amend his complaint to state a legally cognizable claim." Specifically, Judge Peebles recommended that Plaintiff "be given one final opportunity to amend his complaint to set forth plausible claims of defendants' failure to protect him from known danger and medical indifference to his serious medical needs" but not as to his claim that Defendants failed to respond to his related grievances. Defendants have filed a timely objection to the report-recommendation.

## II. STANDARD OF REVIEW

**\*2** When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendation to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General or conclusory objections, or objections where merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *See Farid v. Bouey, 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008).* After reviewing the Report-Recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *See* 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

Defendants objection argues that:

Plaintiffs should not be permitted yet another opportunity to replead. Even given the special solitude afforded to pro se litigants, it was clear error for the Magistrate Judge to recommend that Plaintiff be granted leave in the hope that the he [sic] eventually would stumble upon the correct pleading formula. Plaintiff already has failed on two occasions to follow this Court's unambiguous instructions explaining how to cure the deficiencies in his pleadings ... It should be apparent that he cannot, and that amendment probably will be futile. *See Ruffolo v.. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993)* ...

The Magistrate Judge's determination that Plaintiff was entitled to amend his complaint reasoned that the Court should not dismiss a complaint filed by a pro se litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. He noted that "all of plaintiffs' amended complaints were filed before any discovery, and ... prior to any answer being filed" and that "defendants do not claim any prejudice resulting from plaintiff's repeated amendments." Although, recognizing that Plaintiff had been "forearmed that dismissal would eventuate" and had already "twice amended his complaint" he recommended that "without in any way detracting from the gravity of the court's previous directives to plaintiff, and affording plaintiff the deference to which he is entitled as a pro se litigant" Plaintiff be provided one last opportunity to submit an amended complaint.

The Court adopts the rationale of the Report-Recommendation and holds that in light of Plaintiff's previous warnings he will granted twenty-five (25) days to replead as it relates to his claims of failure to protect and deliberate medical indifference. Such an amended complaint, must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).*

## IV. CONCLUSION

**\*3** Accordingly, the Court adopts the Report-Recommendation for the reasons stated therein and DISMISSES the Second Amended Complaint with LEAVE TO AMEND. Any such Amended Complaint must be filed within twenty-five (25) days of the date of this Decision and Order.

IT IS SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2925362 (N.D.N.Y.)
(Cite as: 2010 WL 2925362 (N.D.N.Y.))

N.D.N.Y.,2010.
Polson v. Fischer
Slip Copy, 2010 WL 2925362 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Craig James SIMS, Plaintiff,
v.
R. Bowen, Correctional Officer at Great Meadow
Correctional Facility, Defendant.
**No. 96-CV-656 RSP/DRH.**

March 23, 1998.

Craig James Smith, Clinton Correctional Facility,
Dannemora, for Plaintiff Pro Se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Attorney for Defendant, Albany, Jeffrey P.
Mans, Esq., Assistant Attorney General, of Counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, D.J.

*1 Defendant R. Bowen, a correctional officer at Great
Meadow Correctional Facility ("Great Meadow"), objects
to Magistrate Judge David R. Homer's recommendation
that I deny Bowen's motion for summary judgment
dismissing plaintiff Craig James Sims' claim that Bowen
violated his Eighth Amendment right to be free from cruel
and unusual punishment.

BACKGROUND

Sims alleges that on November 16, 1995, Bowen told him
that he would have to move from protective custody unit
D-1 to protective custody unit D-2, which also housed A.
Brown. Pl.'s Dep., Dkt. No. 32 Ex. A., at 5, 11. Sims told

Bowen that Brown was a known enemy and supplied a
letter dated October 20, 1995, from Great Meadow's
Superintendent, James Stinson, to Assistant Attorney
General David B. Roberts. *Id.* at 5; Dkt. No. 35 Item 1. In
Stinson's letter-which was apparently written concerning
an earlier request by Sims for protective custody-he said:

Sims has been denied protection because he has one
known enemy that he has named at this facility-INMATE
BROWN # 84-B-2381. All other names that he has given
are either not at the facility or non-existent. The one
enemy that he does name is presently in our protection
unit. Therefore, he cannot be moved to that location if, in
fact, that inmate is indeed his enemy.

Dkt. No. 35 Item 1 at 1. Sims alleges that he also showed
Bowen a copy of a protective custody recommendation.
Pl.'s Dep. at 7. Bowen looked at Sims' documentation and
briefly left the area. *Id.* at 13-14. However, Bowen told
Sims that he would still have to move him to the other
protective custody unit because there had been "an
incident up there with another two inmates." *Id.* at 5-6.

At some point after Bowen placed Sims in a locked cell in
the D-2 unit, Brown-who was on his way the
shower-approached the cell and said, "You all, I want to
talk to you." *Id.* at 17-18. Sims went up to the bars, and
Brown punched him in the face. *Id.* at 20, 21. The blow
did not break Sims' skin or knock him to the floor. *Id.* at
21. Brown then continued toward the shower, and Sims
overheard Brown tell another inmate to throw feces at
Sims. *Id.* at 22. The other inmate followed Brown's
instructions, causing the feces to go into Sims' mouth. *Id.*
at 27.

According to Sims, at shower time, the only correctional
officer on duty in the D-2 unit stays in a bubble-like
structure near the shower area, and an inmate actually lets
protective custody inmates out to take their showers. *Id.* at
17. Because Sims was way in the back of the unit, he
could not promptly notify the officer of the attacks. *Id.* at
23. However, he did tell a correctional officer who passed
by his cell in the middle of the night about the feces
throwing incident. *Id.* at 23. That officer simply told the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))

other inmates to leave Sims alone and stop throwing things at him. *Id.* Sims then decided that the only way to get off the unit and away from his enemies was by cutting his arm with a razor, which he did. *Id.* at 24. Corrections officials then took Sims to the hospital where medical staff disinfected his wounds and-because the inmate who threw the feces had "some kind of sickness, hepatitis or something"-gave him a blood test. *Id.* at 25. Neither that blood test or subsequent blood tests revealed any problem. *Id.* at 27-28. The next morning Sims was moved out of the unit. *Id.* at 27.

**\*2** Plaintiff filed his complaint on April 25, 1996. He requested damages and an order directing defendants to place him in protective custody for the rest of his stay in state prison. Compl. § 3. Stinson was subsequently transferred to Clinton Correctional Facility. On July 30, 1997, Bowen moved for summary judgment. Dkt. No. 29. Sims opposed defendant's motion. *See* Dkt. Nos. 33-36.

On February 11, 1998, Magistrate Judge Homer issued a report-recommendation and order in which he recommended that I deny defendant's motion. Dkt. No. 41. The magistrate judge found that plaintiff created issues of fact under the applicable standard for judging an alleged Eighth Amendment violation. More specifically, the magistrate judge found that (1) Sims offered competent evidence that defendant knew that the D-2 unit contained a purported known enemy of Sims; (2) Stinson's letter stating that Sims could not be placed in protective custody if his known enemy was also in protective custody evidenced the substantial risk of harm from placing Sims in Brown's unit; and (3) Bowen's description of a prior incident involving two protective custody inmates demonstrates that he knew that inmates could still harm each other even though they are usually locked in their cells. Report-Recommendation at 6. Although Bowen argued that Sims cannot establish deliberate indifference because Bowen left Sims for a period of time after Sims informed him that his known enemy was housed in the D-2 unit, the magistrate judge found that Bowen offered no competent evidence that he ever considered Sims' concerns. *Id.* Finally, the magistrate judge rejected Bowen's argument that Sims could not sustain this action because he suffered no compensable injury. *Id.* at 7. The magistrate judge found that if Sims established an Eighth Amendment violation, he could recover nominal damages even in the absence of actual injury. *Id.* at 8.

Bowen filed his objections on February 19, 1996. Dkt. No. 42. Bowen argues that (1) the first assault on Sims occurred only because Sims voluntarily went to the front of his cell; (2) Sims suffered no injury as a result of either of the assaults; (3) Sims was locked in his cell at the time of both assaults and this situation does not present a substantial risk of serious harm; (4) Bowen was not responsible for security on D-2 block when Sims was injured, and his sole involvement was moving Sims from D-1 Block to D-2 Block; and (5) the magistrate erred when he read Sims' testimony as alleging that Bowen had told him of a physical altercation between two inmates on D-2 Unit. *Id.*

DISCUSSION

I. Standard for Review

Because Bowen filed objections, I review the report-recommendation *de novo.* 28 U.S.C. § 636(b)(1)(C).

II. Summary Judgment Standard

Summary judgment shall enter if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The materiality of facts must be determined with reference to the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As to any issue on which the moving party does not have the burden of proof, the moving party may satisfy its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

**\*3** Once the moving party satisfies this initial burden, "the burden shifts to the nonmovant to proffer evidence

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))

demonstrating that a trial is required because a disputed issue of material fact exists." *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993). In satisfying this burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." ' Fed. R. Civ. P 56(e). The opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]erely colorable" evidence will not suffice as a basis for opposing summary judgment. *Anderson,* 477 U.S. at 249-50.

In weighing a motion for summary judgment, the court must accept as true the non-moving party's evidence and make "all justifiable inferences" in the non-moving party's favor. *Anderson, 477 U.S. at 255.* The evidentiary standard governing proof at trial determines how the court must assess the evidence in deciding whether the summary judgment standard has been met. *Id. at 254-55.* In an ordinary civil case, such as this one, where plaintiffs must prove their case by a preponderance of the evidence, the determinative standard is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id. at 252.*

III. The Substantive Law

To hold Bowen liable for an Eighth Amendment violation, Sims must show that Bowen was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] .. and that he [drew] that inference." *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). Sims need not show, however, that he actually incurred serious physical harm. *Gibeau v.. Nellis,* 18 F.3d 107, 110-11 (2d Cir.1994); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997).

The magistrate judge found that a fact finder could infer that Bowen knew that he was exposing Sims to a substantial risk of serious harm because (1) Sims showed Bowen the Stinson letter and (2) Bowen acknowledged that there had been an incident on the D-2 unit that day. Bowen argues correctly that the finder of fact could not

infer without speculating that the incident he described involved physical violence. *See* Pl.'s Dep. at 5. Nevertheless, a fact finder could infer based on Sims' description of the D-2 unit's layout, his testimony that an inmate and not a correctional officer let inmates out for their showers, and his testimony that inmates in the back of the unit could not be seen or heard by the correctional officer on duty during shower time that there could be an opportunity for one inmate to harm another even while the victim was inside a cell. Sims has not offered competent evidence, however, from which the fact finder could infer that Bowen knew Sims was likely to be attacked on D-2 unit. The only evidence in the record relevant to this claim is Sims' statements to both Stinson and Bowen that Brown was his "known enemy." Sims did not claim that he told Stinson or Bowen that Brown had either assaulted or threatened him. The weakness of Sims' contentions contrasts sharply with cases in which the courts have found that there were issues of fact as to whether a defendant knew that he was exposing an inmate to a substantial risk of serious harm. *See Villante v. Department of Corrections of the City of New York,* 786 F.2d 516, 522 (2d Cir.1986) (allegation that plaintiff "was the victim of a pattern of sexual threats and abuse virtually from the time he arrived at the [facility] and that appellees' actions in response to the problem exacerbated it rather than cured it."); *Ayers v. Coughlin,* 780 F.2d 205, 206 (2d Cir.1985) (plaintiff claimed that defendant had specific knowledge of death threats); *cf. Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 29 (2d Cir.1988) (holding on a Rule 12(b)(6) motion that plaintiff stated a claim by alleging that one defendant did not try to stop an attack on him and others knew of a previous fight between him and his assailant and/or a previous attempt on his life by the assailant and/or that the assailant was generally involved in assaults on and extortion from inmates). Correctional officials must respond to a wide variety of institutional needs including the safety of inmates when they decide on a particular inmate's placement. I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference. Therefore, Sims did not produce competent evidence from which a fact-finder could find in his favor.

CONCLUSION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))

**\*4** For the reasons I have discussed, it is

ORDERED that the report-recommendation is not approved; and it is further

ORDERED that defendant's summary judgment motion is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by ordinary mail.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York State Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendant violated his rights under the Eighth and Fourteenth Amendments while he was an inmate at the Great Meadow Correctional Facility ("Great Meadow"). Specifically, he alleges that defendant's actions in moving plaintiff to a cell block where a known enemy of plaintiff's was being held violated the Eighth Amendment's prohibition on cruel and unusual punishment. Plaintiff seeks monetary damages and an order directing that he be placed in protective custody.

Presently pending is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 29. Also pending are motions by plaintiff for the appointment of counsel. Docket Nos. 37, 38 & 40. For the reasons which follow, it is recommended that defendant's motion for summary judgment be denied, and it is ordered that plaintiff's motions for appointment of counsel are denied.

I. Background

On November 16, 1995, while incarcerated at Great Meadow,[FN2] plaintiff was moved from his cell in a protective custody unit (D-1 Block) to a cell in a separate protective custody unit (D-2 Block) by defendant. Def's. Rule 7.1(f) Statement (Docket No. 30) ¶ 1. Plaintiff objected to the move and told defendant that a known enemy of plaintiff's was housed in the unit to which plaintiff was being moved. Plaintiff presented defendant with a letter making reference to plaintiff's alleged known enemy. Id. at ¶ 5. Upon seeing the letter, defendant left plaintiff for a period of time, but returned and transferred him to the other unit. Pl's. Dep. (Docket No. 32, Ex. A) p. 13-14.

FN2. Plaintiff is now incarcerated at the Clinton Correctional Facility.

While locked in his cell in D-2 Block, plaintiff's known enemy, inmate A. Brown, confronted plaintiff and called him to the front of his cell. Plaintiff and Brown exchanged words and then Brown punched plaintiff in the face through the bars of his cell. Def's. Rule 7.1(f) Statement at ¶ 6. Later that day, another inmate, allegedly at Brown's request, threw feces on plaintiff from outside plaintiff's cell. Id. at ¶ 9. Although plaintiff claims to have heard Brown direct the inmate to attack plaintiff, plaintiff did not attempt to notify guards of the threat. Plaintiff received medical attention following the incidents (Docket No. 35, Item 3) and no medical problem associated with either incident has developed.

II. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law, ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. Federal Deposit Ins. Corp. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994); see also Heyman v. Commerce and Industry Ins. Co., 524 F.2d 1317, 1320 (2d Cir.1975). Once the movant has come forward with sufficient evidence in support of the motion for summary judgment,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))

the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. *Fed.R.Civ.P. 56(e); accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

**\*5** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *American Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). "Furthermore, the non-movant 'will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant." ' *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996) (citations omitted).

When summary judgment is sought against a pro se litigant, a court must afford the non-movant special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. Discussion

### A. Defendant's Motion for Summary Judgment

The Eighth Amendment places a burden on prison officials to "take reasonable measures to guarantee the safety of [] inmates ." *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). That burden includes an obligation to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991). Not every injury suffered by one inmate at the hands of another imposes constitutional liability, however. *Farmer,* 511 U.S. at 834. A prisoner asserting an Eighth Amendment claim must establish two things. First, the

deprivation alleged is sufficiently serious. Second, the defendant acted with a sufficiently culpable state of mind. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In the context of a failure to protect claim, the deprivation is sufficiently serious if the inmate is incarcerated under conditions imposing a substantial risk of serious harm. *Farmer,* 511 U.S. at 834. In prison condition cases, the state of mind requirement is one of deliberate indifference to the inmate's health and safety. *Wilson,* 501 U.S. at 302-03. Deliberate indifference requires that a prison official "be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" before Eighth Amendment liability may be imposed. *Farmer,* 511 U.S. at 837.

Defendant contends that plaintiff cannot establish that he was placed in a situation where a substantial risk of serious harm existed because he simply was moved from one protective custody unit to another. The record, however, establishes that the protective custody unit to which plaintiff was moved also housed a person purported to be a known enemy of plaintiff. That such a situation may create a substantial risk of harm is evidenced by a letter from James Stinson, Superintendent at Great Meadow, stating that plaintiff could not be placed in its protective custody unit if a known enemy was also housed there.[FN3] Docket No. 35, Item 1. Moreover, plaintiff alleges that defendant told him he was being moved to make room for an inmate from D-2 Block who had been involved in an "incident" with another inmate on that block. Credited as fact for purposes of this motion, that statement indicates knowledge by defendant that, although locked in their cells, inmates in D-2 Block still may cause harm to each other. A fact-finder could infer from these facts that defendant's transfer of plaintiff to the same unit as Brown deliberately placed plaintiff in a situation which created a substantial risk of serious harm.

> FN3. The same letter questions whether Brown was in fact defendant's enemy, but defendant offers no evidence to show that plaintiff's claim that Brown was his known enemy was unsubstantiated.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))

**\*6** Defendant contends that to establish deliberate indifference, defendant must not have even considered plaintiff's concerns. Defendant further contends that no deliberate indifference can be shown here because, after plaintiff informed defendant that a known enemy was housed on the D-2 Block, defendant left for a period of time before transferring plaintiff. Defendant's claim should be rejected because he offers no evidence to suggest that he ever considered plaintiff's concerns. The mere fact that defendant departed and returned later is no more proof that defendant considered plaintiff's concerns than that he deliberately ignored them. In any event defendant offers no proof of where defendant went or what he did during that interval.

Recovery of compensatory damages under section 1983 requires a showing of actual injury. *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993). However, even absent proof of compensable injury, a section 1983 plaintiff is entitled to nominal damages upon establishing a violation of a substantive constitutional right. *Gibeau v. Mellis,* 18 F.3d 107, 110 (2d Cir.1994). Therefore, since plaintiff can recover damages if he establishes an Eighth Amendment violation, defendant's claim that plaintiff did not suffer an "actual injury" within the meaning of the Eighth Amendment should be rejected.

### B. Appointment of Counsel

Plaintiff's previous request for the appointment of counsel was denied because he had failed to demonstrate his inability to retain counsel from either the private sector or a public interest firm. Docket No. 27. In support of his renewed application, plaintiff has provided this Court with letters that he has apparently received from the public and private sector that substantiate his claimed inability to secure counsel on his own. Docket Nos. 37, 38 & 40. Thus, this Court may properly consider plaintiff's renewed request for appointment of counsel.

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392-93 (2d Cir.1997). Instead, a number of factors must be carefully considered by a court in ruling upon such a motion. As a threshold matter, a court should ascertain whether the indigent's claims seem likely to be of substance. If so, the court should then consider:

The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). That is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (citing *Hodge,* 802 F.2d at 61). With the foregoing standards in mind, the Court will consider plaintiff's renewed application for appointment of counsel.

**\*7** A review of the file in this matter reveals that the issues in dispute herein-whether plaintiff's Eighth Amendment rights were violated-are not overly complex. Further, it appears that to date, plaintiff has been able to litigate this action effectively. While it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of trial, as is the case in many pro se actions brought under section 1983, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez,* 899 F.Supp. at 974. Finally, this Court is unaware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. The Court, therefore, finds that, based upon the existing record in this case, appointment of counsel is unwarranted.

### IV. Conclusion

WHEREFORE, for the reasons stated above it is

RECOMMENDED that defendant's motion for summary judgment be DENIED; and it is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)
(Cite as: 1998 WL 146409 (N.D.N.Y.))


ORDERED that plaintiff's motions for the appointment of counsel are DENIED; and


IT IS FURTHER ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.


Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).


N.D.N.Y.,1998.
Sims v. Bowen
Not Reported in F.Supp., 1998 WL 146409 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
**No. 3:06CV1888 (AWT).**

March 30, 2010.

Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

*RULING ON MOTION FOR SUMMARY JUDGEMENT*

ALVIN W. THOMPSON, District Judge.

**\*1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

handcuffs for the return trip to Osborn.

The plaintiff avers that, at the beginning of the return trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

**\*2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined the plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000)(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252.

**\*3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

## III. Discussion

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

> **FN1.** Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

## A. Constitutional Violation: Conditions of Confinement

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009).

In *Gill v. Riddick,* No. Civ. 9:03-CV-1456, 2005 WL 755745 (March 31, 2005), the court stated:

> A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

*Id.,* at *16(internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

*\*4 The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009) (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) ( "civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,*

387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

**\*5** Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008) (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004) ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003) (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998) (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16 (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997) (lack of a working toilet in prison cell for approximately 10

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

**\*6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003)("[I]n the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.
May v. DeJesus
Slip Copy, 2010 WL 1286800 (D.Conn.)

END OF DOCUMENT



Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.)[FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name.[FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Compl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63.)

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

*DISCUSSION*

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt's liking; and (iii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra*. The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

**\*5** As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

**\*6** It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, Correction Law § 851 *et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 *et seq.,* contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

Correction Law § 855(9). Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 *et seq.* In addition, courts that have considered whether inmates in

New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

### III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

*7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.*, visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to

engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it has been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995
Greenwaldt v. Coughlin
Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1995 U.S. Dist. LEXIS 7136, *



LEXSEE 1995 US DIST LEXIS 7136

**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURNCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURNCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants. [1]**

1   Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 7136*

**May 22, 1995, Decided
May 23, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P. 4(k)*. Defendants were not subject to federal interpleader

jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and

1995 U.S. Dist. LEXIS 7136, *

non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
*Governments > Federal Government > Employees & Officials*
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1)*.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations*
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1)*.

*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

*Civil Procedure > Pleading & Practice > Service of*

*Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Parties > Interpleaders > General Overview*
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General*

1995 U.S. Dist. LEXIS 7136, *

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See *28 U.S.C.S. § 1391(a)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN9] See *28 U.S.C.S. § 1391(1)*.

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses,*

*Demurrers & Objections > Failures to State Claims*
*Civil Rights Law > General Overview*
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1]  HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ.,

1995 U.S. Dist. LEXIS 7136, *

MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines

on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*) [2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, [*6] it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

2   Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

3   Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8]   The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman

also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

4   The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.

5   The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11]  Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

### The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's

dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P. 4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1)* and *4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See N.Y. Civ. Prac. L. & R. §§ 308, 311* (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks

1995 U.S. Dist. LEXIS 7136, *

jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k).* Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19.* In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a).* The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a).* Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1).* Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17]  was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983).* These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332.* They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18]  address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnaping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

6   We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is

1995 U.S. Dist. LEXIS 7136, *

an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. § 1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332. Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

**C. Venue**

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are

entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a). Section 1391(b)* provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir.*

*1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7     J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular

conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25] of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363.*

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27]

1995 U.S. Dist. LEXIS 7136, *

amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

> 8   Former Supreme Court Justice Harry A. Blackmun.
> 9   We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993),* aff'd *41 F.3d 1500 (2d Cir. 1994);* cf. *Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

**IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions**

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

**CONCLUSION**

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayhertz Amusement Corp., 139 F.2d 871, 875* (3d Cir.) cert. denied, *322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE